UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JOVELL WHITE-SPAN,

                        Petitioner,

        v.                                              9:21-CV-1292
                                                        (DNH)

JOSEPH COREY, SUPERINTENDENT

                        Respondent.

_____

APPEARANCES:                            OF COUNSEL:

JOVELL WHITE-SPAN
Petitioner, Pro Se
15-A-0397
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

HON. LETITIA JAMES                      JAMES FOSTER GIBBONS, ESQ.
Attorney for Respondent                 Ass't Attorney General
New York State Attorney General
The Capitol
Albany, New York 12224

DAVID N. HURD
United States District Judge

**DECISION and ORDER**

I.      **INTRODUCTION**

        On December 3, 2021, *pro se* petitioner Jovell White-Span ("Petitioner") filed this

action seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254.  Dkt. No.

1, Petition ("Pet."); Dkt. Nos. 2–2-3, Exhibits; Dkt. No. 3, Letter Enclosing Filing Fee;

1

docket entry dated December 6, 2021 (identifying receipt information for the filing fee transaction).[1]

On December 10, 2021, Respondent Joseph Corey, the Superintendent of the facility where petitioner was incarcerated, ("Respondent") was ordered to respond to the petition.  Dkt. No. 4.  Thereafter, Respondent successfully requested three extensions of time to file a response and permission to file an oversized brief.  Dkt. Nos. 6, 8, 10, Letter Motions (requesting an extension of time); Dkt. No. 12, Letter Motion (requesting permission to file an oversized brief); Dkt. Nos. 7, 9, 11, 13, Text Orders (granting requests).

On August 22, 2022, Respondent finally submitted a response.  Dkt. No. 14, Response; Dkt. No. 14-1, Respondent's Memorandum of Law in Opposition to Petition; Dkt. No. 15, State Court Records ("SR"); Dkt. No. 16, State Court Records ("T").  Thereafter, Petitioner successfully requested an extension of time and permission to file an oversized reply.  Dkt. No. 18, Letter Motion (requesting an extension of time); Dkt. No. 20, Letter Motion (requesting permission to file an oversized reply); Dkt. Nos. 19, 21, Text Orders (granting requests).  Petitioner filed a reply on November 28, 2022.  Dkt. No. 22, Traverse.

The petition is fully briefed and will be considered on the basis of the submissions without oral argument.

---

[1] All citations to the parties' submissions will refer to the pagination generated by CM/ECF, the Court's electronic filing system.

## II.   <u>RELEVANT BACKGROUND</u>

### A.   <u>Indictment</u>

In an indictment dated April 22, 2014, an Albany County Grand Jury charged Petitioner and a co-defendant named Jahmeek Croley with Murder in the Second Degree in violation of N.Y. PENAL LAW ("P.L.") § 125.25(1) and Conspiracy in the Second Degree in violation of P.L. § 105.15.  SR 21-22, Indictment.

The Grand Jury found that Petitioner and Croley "with intent that a class A felony be performed . . . did agree with another to commit the crime of Murder in the Second Degree" and "with intent to cause the death of another person . . . did cause the death of one Edward Maxim by means of shooting said victim with a pistol."  SR 21-22.

### B.   <u>Jury Trial</u>

Petitioner and Croley's jury trial before Albany County Court commenced on October 29, 2014.  *See generally*, T 17.  After jury selection, Croley and Petitioner's attorneys moved to dismiss the count of Conspiracy in the Second Degree pursuant to P.L. § 210.10(1)(a).  T 374.  The People consented to dismissal of that charge and Albany County Court granted the defendants' motion.  T 382-83; T 390.  Thereafter, the People proceeded to present their case on the second-degree murder charge, the relevant portions of which are summarized below.

Donald Columbus testified on October 19, 2013, he went with his friend "EJ" Maxim and Donovan Johnson to a party at the YMCA.  T 474.  Columbus stated the three left the party and drove to "Willies" bar in his white Infiniti.  T 475-76.  Columbus parked his car on a side street approximately "[f]our or five car lengths away from" the

intersection.  T 478.  Columbus testified the three men entered the bar and remained inside for "[a]bout a half an hour."  T 477.

Columbus recalled he exited the bar with Maxim and walked towards his car, but saw Jamil Jordan as they crossed the street.  T 477-78.  Columbus proceeded to his car while Maxim continued a conversation with Jordan.  T 478.  Columbus testified he then "heard gunshots" coming from "behind" him and "ran."  T 478-79.  Columbus stated he did not see Maxim fall, nor did he see anyone with a gun.  T 479.  Columbus testified he lost a "chain" necklace near his car which "popped when [he] was running[.]"  T 481.

When Columbus returned, he observed Jordan and another individual "putting [Maxim] into a car going to the hospital[.]"  T 482.  Columbus stated he and Jordan returned to Willies' after the shooting and "tried to get Donovan to come outside . . . [to] go to the hospital[.]"  T 483-84.  Columbus testified he later went to the hospital.  T 483.

Steven Whittingham testified he went to a party at the old YMCA building on October 18-19, where he met up with Jamil Jordan.  T 460.  Whittingham testified he and Jordan left the YMCA together to go to a party at Willies bar.  T 461.  Whittingham and Jordan walked towards Willies, traveling west on Washington Avenue.  T 461.  But Whittingham and Jordan stopped when they ran into Jordan's friends "Donald and EJ" and "had a quick conversation."  T 461-62.  The four men discussed the environment of the party at Willies and Whittingham testified that Maxim, Columbus, and Jordan planned to smoke some marijuana together. T 463-64.  So Whittingham continued west on Washington towards Willies' bar as the others went the opposite direction.  *Id*.

As he walked along Washington Avenue on the side of the street opposite of Willies, Whittingham "heard a few gunshots" coming from "[b]ehind [him]."  T 464-65.

4

Whittingham testified he "paused" because he was "shocked" but then ran west towards the corner, where he warned others to avoid the area, then turned and continued south on Quail Street.  T 464-70.

Jamil Jordan testified that he attended a party at the old YMCA on October 19, then left with his friend Whittingham.  T 843-44.  Jordan stated that he and Whittingham headed to Willies bar, but saw his cousin Maxim and "Donald" on the way.  T 844-45. Jordan recalled he told Whittingham he was going to smoke weed with Maxim and Columbus, then started walking towards Columbus' parked car on Cortland.  T 845-46. Jordan heard shots fired and "took off to run" in the "same direction" he had been walking but "fell" and stayed down until the sound of shots stopped.  T 846.  Jordan recalled that he dropped his "iPhone" when he fell and when he stood up, "[he] walked towards the street where the car was and there was [Maxim] laying in the street."  T 847.

Jordan started to pick Maxim up and Otero arrived "soon after" and helped Jordan load Maxim into his car.  T 847.  Jordan stated he "was going to" go to the hospital with Maxim but "decided to get out of the car" and saw Columbus.  T 847-48. Jordan stated he "brought [Columbus] to the bar" but did not enter Willies himself.  T 848.

Joshua Otero testified he went out on October 19, 2013, and spent "four or five minutes" at Willies, where he saw his cousin Maxim.  T 514.  Otero later returned to his vehicle and drove down Spring Street, but as he approached the end of the street he "heard shots[.]"  T 517-48.  Otero turned left onto Cortland Place and "s[aw Maxim] laying on the ground" in the street "[m]ore towards the corner."  T 518.  Otero estimated

"10 [to] 20 seconds" elapsed between the time he heard gunshots and the time he saw Maxim laying in the road.  T 521.

Otero testified he "jumped out [of] the car" when he saw Maxim "throwing up" then saw Jordan "jump out from behind [a] car" and the two "hurried up, picked [Maxim] up[, and] threw him in the car."  T 519-20.  Otero recalled Jordan left after helping Maxim into the car while Otero drove to the hospital.  T 520.  Otero stated he later saw Columbus at the hospital.  T 520.

Donovan Johnson testified he went to a party at the YMCA on Washington Avenue with Maxim and Columbus, then drove Columbus's car towards Willies and parked on Cortland Place.  T 576-77.  Johnson stated the three walked into Willies together and confirmed their entrance was depicted on video footage around 1:44 a.m.. T 578-82.  Johnson estimated the three spent approximately forty minutes in the bar before Maxim and Columbus departed.  T 578-79.  Johnson remained in the bar and continued drinking until he received a call from Columbus and learned someone had been shot.  T 579.

Christopher Tiburcio testified he was outside "on Quail Street" early in the morning on October 19, when he "heard fighting noise" which he "assumed . . . was his friends so" he "ran towards where [he] thought [his] friends were . . . [a]round Willies Bar."  T 588-89.  As he approached, a white car belonging to Tiburcio's friend's mother "came by" and Tiburcio learned his friends were not the source of the noise.  T 590-92. Therefore, Tiburcio testified he ran "back towards Quail" and agreed video footage showed him "running back towards Stewart's and meeting up with some people in front of Stewart's[.]"  T 590-93.

6

Timothy Pfeiffenberger was working at the "Smokin' Bull" bar, located on the "[c]orner of North Lake [Street] and Washington Avenue" on October 19, 2013.  T 594-95.  While he was cleaning up the bar, around 3:15 a.m., Pfeiffenberger "heard two gunshots[, t]hen [he] walked up towards the corner and heard about three or four more[.]"  T 595.  Pfeiffenberger explained the sound of gunshots was coming from the west, in the direction of Quail Street.  T 595-96.

At the corner of North Lake and Washington, Pfeiffenberger "saw a gentleman jogging from the intersection of Cortland and Washington . . . towards North Lake, running in front of some traffic, in between cars."  T 596.  Pfeiffenberger identified Petitioner as the individual and testified that Petitioner "[p]assed directly by [him], about two feet away from [Pfeiffenberger], and then proceeded up North Lake towards Central Avenue."  T 596-97.  Pfeiffenberger recalled Petitioner had "deadlocks about four to six inches long, [was] about 5'8, [and] had a blue hoodie on with gold USA [lettering] across the front of it."  T 596.  Pfeiffenberger testified Petitioner was "running" and "[p]ulling [his] pants up[, and j]ust seemed to be fleeing the scene."  T 596-97.

Huie Courtney testified that around 3:00 a.m., he was "walking on the side of the Smokin' Bull" Tavern on North Lake Street towards Washington Avenue, and as he "turned onto Washington Ave, [he] heard probably two shots; and then . . .  another three."  T 528.  Courtney explained the sound of shots came from the side street "Cortland" Place.  T 529.  As he walked into the street heading west on Washington Avenue, Courtney saw "a gentleman coming towards [him] from across the street and [the two] like kind of met up in the middle of the street at the yellow line[.]"  T 529.

Courtney recalled he "s[aw] him take his hood off and like a skull cap or a do-rag fell off[.]"  T 530.

Courtney described the man as "a short black male with shoulder-length dreads" wearing "dark-colored clothing" with some kind of "lettering" on his shirt.  T 529-30. Courtney recalled that the man had "his hands in his hoody" and was "walking . . . [at a f]ast pace like he was just trying to get away from the scene."  T 532.  Courtney stated the man was "walking kind of fast past" him and "once he turned the corner, he took off" so Courtney "kept going towards Cortland."  T 530.

Courtney recalled that he "s[aw] another gentleman running the opposite way" of the man coming towards Courtney who "was tall, dark skinned" wearing "dark clothes" and a "bubble coat[.]"  T 530.  "When [Courtney] got to the corner of Cortland[ and Washington], [he] s[aw] the guy laying in the street . . . surrounded by blood, and . . . two other guys that were trying to get him in the car . . . saying get him in the car, get him in the car."  T 530.

Albany Police Officer Altin Miftari was dispatched to the area of Cortland Place and Washington Avenue at approximately 3:10 a.m.  T 421-23.  Miftari observed blood and a hat "in the middle of the road" on Cortland Place "just south of" the intersection.  T 423.  Miftari was instructed to respond to the hospital.  T 423-24.  Miftari "tried making contact with the victim" in the emergency room but "[Maxim] was unresponsive."  T 428.

Emergency physician Michael Dailey treated Maxim at the Albany Medical Center.  T 555-56.  Dailey testified Maxim arrived at the emergency department in a private vehicle and was "very-clearly-injured" by gunshot wounds to the head and torso.

T 557.  Dailey testified that hospital staff placed a breathing tube to assist with Maxim's breathing, began to stabilize bleeding, and began a radiographic evaluation.  T 557-58.

Dailey explained that Maxim suffered "a very dramatic injury to the head where the bullet went in one side of his head [and] came out the other side" and recalled "[t]here were bullet fragments throughout the brain matter[;] . . . swelling in the brain itself[;] and . . . multiple kinds of bleeding within the skull" which Dailey and neurosurgeons "immediately recognized" would be "a fatal wound."  T 559-60.

Maxim later went into cardiac arrest.  T 561.  Dr. Bernard Ng, the Albany County coroner's pathologist performed an autopsy on Maxim on October 20, 2013.  T 869-71. Dr. Ng testified he discovered evidence of three gunshot wounds: "[o]ne was on the head, one was close to the elbow area of the right arm, and the other was in the left groin region" and each was "associated with an exit wound[.]"  T 872.

Concerning the groin injury, Dr. Ng explained that "the bullet enter[ed] in the front of the body and then exited the back and in the process fractured the top of the left femur" an injury which "would have been sufficient to immobilize the victim . . . render him unable to run anymore or support his weight[.]"  T 873.  Turning to the head wound, Dr. Ng testified "the entrance wound left a penetrating injury . . . on the upper part of the left forehead" and an exit wound was located "on the right temple area."  T 874.

An internal examination revealed "extensive destruction of the front part of the brain and also extensive skull fracture."  T 875.  Dr. Ng measured the wounds and concluded the size suggested the wounds were caused by a ".40" caliber bullet.  T 874. Dr. Ng opined Maxim's cause of death was "extensive head trauma as a result of a gunshot wound to the head."  T 880.

Detective Dean Halpin arrived to process the scene the morning of October 19, 2013, and observed "blood and vomit and a hat" in the road.  T 621.  Halpin testified that he located a piece of a projectile "in the middle of the street near the bloodstained area where the victim had been" and "shell casings . . . scattered in a small area" on the "west side" of the street just "north of the location of the bloodstain[.]"  T 623, 628.

The Detective testified he also located "a gold-chain" found "just west of the bloodstain in the street" and a "white [iPhone] cell phone with a cracked screen[.]"  T 627-28.  Halpin further testified vehicles parked on Cortland Place appeared to have been struck by bullets.  T 625-26.  Detective Halpin went to the Albany Medical Center where he documented and photographed the vehicle in which Maxim had been transported and recovered a black wallet containing Maxim's personal papers.  T 630-32.  Halpin later returned to the scene where he recovered "a do-rag or stocking cap . . . just out from the curb" in the "area in front of 460 Washington Ave."  T 633-34.  Finally, Detective Halpin testified he secured a buccal swab from Petitioner to collect his DNA on July 18, 2014.  T 642-43.

Albany Police Officer William DiCarlo testified he collected video footage from "Willies Sports Bar[,]" located at 497 Washington Avenue; "Stewart's," located at 515 Washington, at the corner of Quail Street; and an apartment building, located at 522 Washington.  T 432-36.  Albany County Court admitted portions of the video footage from the aforementioned locations.  T 436-41.

DiCarlo explained he compared the depicted times on the camera devices with the Naval Observatory time and determined the times portrayed on the Willies footage were approximately nineteen minutes slow, the times on the Stewart's video footage

were approximately seven minutes slow, and the times on the video footage from the building at 522 Washington were approximately fourteen minutes slow.  T 448-51.

Jason Cooper of the New York State Police forensic video unit "compile[d] clips from" the video footage collected from "Willies Bar . . . Stewart's . . . [and the] apartment complex at 522 Washington" to create a "timeline."  T 819-22.  Cooper testified he did not change the video, but added "spotlights" to the footage, which he described as "a red circle [placed] around a person of interest or a vehicle of interest or an object of interest[.]"  T 822-24.

Cooper explained that he used such a "spotlight" around a person wearing a hat in one portion and, in a subsequent portion, as "two objects move[d] across the street" in the footage from 522 Washington Avenue and then "another one seconds later."  T 826-27.  The compiled video clips, totaling thirty minutes in length, were admitted and played for the jury.  T 826-27.

Detective Christopher Cornell testified that he reviewed the video footage from Willies Sports Bar at 497 Washington Avenue, the Stewart's at 515 Washington at the corner of Quail Street, and the apartment complex at 522 Washington during the investigation.  T 673.  The prosecutor played video footage "from Willies" starting around the labeled time of 1:48 a.m.,[2] and Cornell identified defendant Croley on the footage "enter[] the bar" wearing a "red Cincinnati hat" and "noticeable goatee."  T 719-21.  Cornell testified the footage captured "bouncers" who "either frisk or wand the patrons . . . as they enter the bar."  T 720.

---

[2] Officer DiCarlo testified the annotated times on the footage collected from Willies were approximately nineteen minutes slow. *See* T 448-51.

In footage "from the Stewart's camera" starting around the labeled time of 2:30 a.m.,[3] Cornell identified a "vehicle enter the parking lot" containing a "black male" driver wearing "a red and black Cincinnati baseball hat," a "black in color tee shirt over a white in color long-sleeve shirt, blue jeans, [and] white sneakers" as well as a "passenger . . . wearing a blue-hooded . . . U.S. Polo sweatshirt" which featured "USA letters in gold as well as [a] big Pony symbol on the chest" and "very distinctive . . . black and yellow . . . Nike Foamposit[]" sneakers.  T 680-81, 677.

Cornell testified that he located "the USA sweatshirt person" on "[t]he Willies video" and stated, in the footage, the passenger "[n]ever enters the establishment but makes several passes back and forth."  T 682.  Cornell explained the individual in "the Cincinnati Reds hat" was also depicted on the footage as "[h]e re-enters Willies[.]"  T 682.

Detective Cornell testified that "the first call" reporting shots had been fired "was dispatched at approximately 3:09."  T 675.  In the video footage from Willies, at "[a]bout [sic] 3:09, which the time stamp . . . [labeled as] 2:49," Cornell explained "you'll see the security staff start to usher people as they react to what [investigators] believe are the shots being fired."  T 675.

As the "bouncer" ushered the patrons "in a westerly direction[,]" Cornell identified the individual wearing the "red and black Cincinnati baseball hat, black tee shirt over a long-sleeve white tee shirt, blue jeans and white sneakers . . . running in a westbound direction heading towards Stewart's."  T 677.  Detective Cornell explained this individual

---

[3] Officer DiCarlo testified the annotated times on the footage collected from Stewart's were approximately seven minutes slow. *See* T 448-51.

running "drew [his attention] to the Stewart's parking lot where" a vehicle's "alarm . . . started to go off."  T 674.

Cornell testified that in a portion of "the Stewart's video" labeled around "3:01[,]" he discovered "the continuation of the path of the individual . . . wearing the red and black Cincinnati hat[.]"  T 678-79.  Detective Cornell concluded "the car alarm . . . antitheft system" appeared to have been "triggered[,]" therefore, the individual "ha[d] to exit the vehicle to unlock it manually and then re-enter the vehicle again."  T 679.  Next, Cornell explained the vehicle backed out of the Stewart's lot, traveling "southbound, and then" in another camera angle, continuing "in an easterly direction on Washington Avenue."  T 679-80.

Cornell explained that the video from the apartment building captured what the detective determined to be "Chris Tiburcio running in that area."  T 692.  Cornell testified that he identified Tiburcio by locating the operator of a white "Buick Rendezvous" depicted turning "right . . . off of Quail Street [on]to Washington" who was a friend of Tiburcio's.  T 692-93.

Officer Michael Commisso testified that he conducted a traffic stop of "a Nissan Maxima with New York registration[,]" license plate number "FZW7344" on November 6, 2013.  T 659.  Commisso identified defendant Croley as the driver of the vehicle and recalled Croley stated his address was "237 North Pearl Street in the city of Albany."  T 660.  The People admitted still images from the police vehicle video recording of the encounter.  T 661, 665.

Detective Cornell also testified he had been "involved in a traffic situation" on October 15, 2013, with "a gray Nissan Maxima license plate FZW7344[.]"  T 669-70.

Cornell identified Croley as the operator of the vehicle, but testified the vehicle was "registered to Marquis Turner at 237 North Pearl Street[.]"  T 670-71.  Cornell identified "237 North Pearl" as "the Wilson household" and testified "Rayana Wilson" resided at the address with "Marquis Turner[.]"  T 739.  Detective Cornell stated "Rayana Wilson" was "Croley's significant other" and stated the two had a child together.  T 721.  Cornell subsequently took photographs of the vehicle on November 7, 2013, while it was parked "at Catherine Street and Morton Ave in the city of Albany" which the People entered into evidence.  T 671-73.

As a part of the investigation into Maxim's death, Cornell testified that he investigated "social media websites" and, using "a Facebook search[,]" discovered "a photograph of a black male wearing a blue, navy, hooded sweatshirt, Polo USA logo with the emblem of a big Pony . . . [and] yellow and black Nike Foamposits."  T 682, 691.

Cornell identified Petitioner as the individual depicted in the photograph.  T 691.  Albany Police Department detective sergeant Josiah Jones assisted with the execution of a search warrant at 85 Aiken Avenue on April 21, 2014.  T 523-25.  Jones located Petitioner and transported him "from the front of 85 Aiken Ave[.]" to an Albany Police Department office for an interview.  T 525.

Detective Cornell testified he and Detective James Olsen conducted an interview of Petitioner on April 21, 2014, at the Albany Police Department.  T 694.  Cornell explained the interview room was equipped with recording equipment and the People admitted into evidence and played for the jury a CD containing the redacted interview of the Petitioner.  T 694-96, 707-09.

During the interview, Cornell stated that Detective Olsen showed Petitioner the "image obtained from Facebook depicting [Petitioner] in a blue-colored hoody, USA in gold lettering with the big Pony sweatshirt [and] . . . yellow and black Nike Foamposits" and "asked if he knew what it was and he said, you know that's me."  T 709-10.  Later in the interview, Cornell showed Petitioner the "portion of the Stewart's video . . . where the Nissan Maxima is arriving in the parking spot and the two occupants [were] exiting the vehicle and walking towards the direction of 497 Washington Ave, Willies Sports Bar" and one of the detectives asked "do you recognize that car[?]" pointing out the Nissan Maxima, but Petitioner answered "[n]o."  T 714.  Detective Cornell also asked Petitioner "do you recognize this person[?]" pointing to "[t]he driver of the vehicle" wearing the "Reds hat" and Petitioner "said he didn't know that person[.]"  T 715.[4]

Norman Clark, a custodian of records for Sprint, testified the phone number "518-315-7356" was assigned to a prepaid phone.  T 562-65.  Clark also explained data contained in the records attributed to said phone.  T 566-72.

Brian Harrington, a custodian of records for Facebook, testified about an account's records which the People entered into evidence.  T 851-52.  The account's "user name" was redacted, but Harrington stated the user input "ATM Snow" as an

---

[4] When the interview concluded, Petitioner remained in interview room five and Detective Cornell provided him a telephone.  T 715.  Cornell identified "People's [Exhibit] 70" as another portion of "the recording from interview five" which contained "the phone . . . that [Petitioner] made after [the detectives'] interview with him[.]"  T 716.  The exhibit was admitted over defense counsel's objection.  T 719.  Petitioner and Croley's attorneys objected to the admission of People's Exhibit 70 and the prosecutor explained the recording was "very relevant" because "this is a phone call where [Petitioner] calls someone and tells then to get ahold of Meek[.]"  *See* T 716-19.  Detective Marissa Shane identified "People's Exhibit 72" as a "CD of the phone call" made in "interview room five" which included "both the caller and the person on the other line[.]"  T 773-74.  The People admitted the exhibit into evidence.  T 774-75.  "[A] clip that combines People's 70 and 72" was published for the jury after Dr. Ng, the People's final witness, testified.  T 887-88.  During the People's summation, the prosecutor played a portion of a video and stated, in the clip, Petitioner said: "Hey, this is Snow from the yard. Okay? Tell Meek. Snow from the yard. Tell Meek they have me downtown. And the guy says downtown in Alb? Yeah, downtown in Alb. I need him to come down here. Tell him it's an emergency."  T 977-78.

"alternate name" or "nickname" for the account, and listed "Da Yard . . . Albany . . . New York . . . 12207 . . . USA" as the address.  T 859-60.

Harrington testified about messages sent from and received by the account and explained the account's user, in messages, wrote "It's Jovell" on one occasion and, on another occasion: sent a message reading "U got my number?[;]" received the response "Naa. What is it?[;]" and then wrote "301-7356[.]"  T 861-63.

Victor Pizzola of the Albany Police Department Forensic Investigations Unit assisted in processing the scene of a search warrant executed on April 21, 2014, at "85 Aiken Ave[.]" in Rensselaer.  T 487, 497-98.  Pizzola discovered a document "from the New York State Department of Tax and Finance . . . addressed to Mr. Jovell White-Span . . . inside the apartment at 85 Aiken Avenue[.]"  T 503.  Pizzola recovered "a Samsung cell phone" at the apartment.  T 498.  Pizzola determined "(518)301-7356" was the phone number assigned to the aforementioned phone.  T 504-08.

Henry Enright, a custodian of records for AT&T, testified the phone number "518-478-4920" was active from February to December of 2013.  T 760-64.  Enright identified the subscriber of the aforementioned number as "Rayana L. Wilson" and the associated address as "237 North Pearl Street" in Albany.  T 763.  Enright also explained portions of the phone record data, including a call placed to "518-315-7356" at 2:25 a.m. on October 19, 2013, which lasted five seconds.  T 768.

Anne-Laure Delcerro, a crime analyst, performed an analysis of "calls made between phone numbers 518-478-4920 and 518-301-7356" and created a "map" documenting the calls.  T 777-81.  The People admitted the "map" which documented the locations and times the aforementioned phone numbers made and received calls.  T

780-82.  Delcerro explained calls from "478-4920" used a tower located at 400 Hudson Avenue between 2:10 and 3:12 and calls from "301-7356" used the same tower between 2:42 and 3:12.  T 784; *see also* T 785 (explaining a call made by "478-4920" at 2:10 a.m. "hit[] off th[e] tower at 400 Hudson Avenue" and was "received by 301-7356 . . . [o]ff of a tower hit in the 600 Boulevard area" but, with a subsequent call at 2:42 a.m., both phones "hit[] off the 400 Hudson Avenue tower[.]").

Albany Police Forensic Investigation Unit member Stephen Behrens processed the "2006 white Infinity" vehicle which belonged to Columbus.  T 652-53.  Behrens testified he observed holes on the vehicle which were consistent with having had a projectile fired through it, explaining the "trajectory w[as] consistent with one expended projectile traveling through th[e] passenger [side] mirror into the front hood" and stated a projectile was located "in the front radiator of the vehicle but" was "unrecoverable" as it had been "destroyed in the radiator area."  T 655.  Based on the trajectory of the projectile, Behrens "conclu[ded] that the door was open at the time of the incident[.]"  *Id*.

New York State Police forensic scientist Amy Donohue testified she performed DNA testing of "a control sample[,] . . . a do-rag and some shell casings."  T 790; T 797.  Donohue stated "[n]o DNA results were obtained from the shell casings" which she described as typical in her experience.  T 798.

Donohue explained she placed the do-rag into a test tube which she "submitted for DNA analysis where it went through an extraction, quantification, amplification, and then it was ran on an instrument" which developed a mixture "profile."  T 800.  Donohue also developed a profile for Petitioner using the "buccal swab[.]"  T 801.  Donohue

concluded "[t]he STR DNA profile from the major contributor of the do-rag matched the STR DNA profile from [Petitioner]."  T 802.

Forensic scientist Andrea Lester conducted an analysis on the recovered shell casings.  T 811-13.  Lester "evaluated the class characteristics" of the six shell casings and "determine[ed] that they were all of the same caliber firearm[.]"  T 815-16.

After the People rested their case, both defendants moved the trial court for an order of dismissal.  *See* T 888-96.  However, the Albany County Court denied the defendants' motions.  T 899.  Neither Petitioner nor Croley presented a defense case. T 901.  The parties delivered summations, *see* T 919-1007, the Albany County Court instructed the jury, *see* T 1008-39, and the jurors began deliberations.  The jury unanimously found both Petitioner and Croley guilty of Murder in the Second Degree.  T 1044-45.

## C. Sentencing

On January 21, 2015, Petitioner reappeared before the Albany County Court for sentencing.  *See generally*, T 1051-68, Sentencing Transcript.  Defense counsel moved to set aside the jury's verdict as against the weight of the evidence pursuant to C.P.L. § 330.30(1).  T 1055-56.  The County Court denied Petitioner's motion.  T 1056.

The People requested that Albany County Court impose the maximum sentence. T 1064.  The County Court sentenced Petitioner to an indeterminate term of twenty-five years to life imprisonment for his conviction of Murder in the Second Degree.  T 1064.

## D. C.P.L. § 440.10 Motion to Vacate

On March 21, 2017, Petitioner moved to vacate his judgment of conviction pursuant to C.P.L. § 440.10.  SR 65-159, Motion to Vacate and Supporting Documents.

There, Petitioner argued that: (1) prosecutorial misconduct rendered the Grand Jury proceedings "defective[;]" (2) "[p]rosecutor[ial misconduct] during [the People's] summation" deprived Petitioner of his right to a fair trial; (3) "[Petitioner] was deprived of [the] effective assistance of [trial] counsel[;]" and (4) "[Petitioner]'s conviction for murder in the second degree was not supported by legally sufficient evidence[.]"  SR 72-73. The People opposed Petitioner's Motion.  SR 478-92, Affirmation in Opposition to Motion.

The Albany County Court held that: Petitioner's challenge to the Grand Jury proceedings was a matter properly resolved by direct appeal; the trial court's denial of Petitioner's motion to dismiss based on the sufficiency of the evidence was similarly reviewable on direct appeal; and the prosecutor's use of a PowerPoint during the People's summation did not constitute misconduct depriving Petitioner of his right to a fair trial.  *See* SR 493-97, Decision and Order (dated September 1, 2017).

However, the County Court ordered a hearing on Petitioner's ineffective assistance claim to determine whether Petitioner's counsel's "failure to cross-examine Columbus on the text message issue, and/or . . . failure to call Detective Olsen as a witness relative to his observation of text messages, r[ose] to the level of less than meaningful representation."  SR 496.

The Albany County Court conducted a hearing on November 8, 2017, the relevant portions of which are discussed in greater detail below.  SR 499.[5]  Based on testimony presented at said hearing, the County Court concluded that Petitioner "failed

---

[5] Documents purporting to be excerpts of the transcript from the aforementioned hearing were included in the Petitioner's and the Peoples' Appendixes submitted to the Appellate Division, submitted by Petitioner in the instant action as Dkt. No. 2.  *See generally*, Dkt. No. 2-2 at 405-36; Dkt. No. 2-3 at 51-71.

to meet [his] burden to establish trial counsel's performance was constitutionally
deficient" and denied Petitioners § 440 in its entirety.  SR 498-501, Decision and Order
(dated November 14, 2017).

### E. <u>Direct Appeal</u>

Petitioner appealed his judgment of conviction to the Appellate Division, Third
Department.  *See* SR 518-88, Petitioner's Appellate Division Brief; *see also* SR 589-
644, The People's Appellate Division Brief.  In his counseled brief, as relevant here,
Petitioner argued: (1) Petitioner was deprived of his constitutional right to the effective
assistance of counsel (SR 561-73); (2) the evidence was legally insufficient to establish
Petitioner committed murder in the second degree and the jury's verdict was against the
weight of the evidence (SR 574-79); and (3) the prosecutor committed misconduct
during summation which violated Petitioner's constitutional right to due process (SR
580-83).

On April 30, 2020, the Third Department affirmed Petitioner's judgment of
conviction.  *See People v. White-Span*, 182 A.D.3d 909 (3rd Dept. 2020).[6]  The
Appellate Division held Petitioner's legal sufficiency claim was "unpreserved[,]" and
further found the jury's verdict was "supported by the weight of the evidence."  *Id*., 182
A.D.3d at 910-13 (citations omitted).  The Third Department concluded Petitioner "was
provided with meaningful representation" and "County Court properly denied
[Petitioner]'s CPL 440.10 motion."  *Id*., 182 A.D.3d at 916 (citations omitted).  Finally,
the Appellate Division observed "the prosecutor's summation was proper and fair
comment on the evidence."  *Id*.

---

[6] A copy of the Third Department's Memorandum and Order affirming Petitioner's judgment of conviction
is included in the State Court Records.  *See* SR 645-55.

Petitioner sought leave to appeal the Third Department's decision to the Court of Appeals.  *See People v. White-Span*, 35 N.Y.3d 1071 (2020).[7]  The Court of Appeals denied Petitioner's application for leave to appeal on August 5, 2020.[8]  *Id*.

### F. Writ of Error Coram Nobis

On October 1, 2021, Petitioner filed a Motion for a Writ of Error Coram Nobis. *See* SR 657-77, Petition for a Writ of Error Coram Nobis and Papers; *see also* SR 678-709, The People's Affirmation in Opposition to Petition and Exhibit.  Petitioner alleged he was denied the effective assistance of appellate counsel because counsel failed to raise two meritorious issues on Petitioner's direct appeal, specifically that *trial counsel* provided ineffective assistance by failing to remove a "grossly unqualified" juror and failing to request a mistrial based on the Albany County Court's failure to dismiss the aforementioned juror.  *See* SR 667-76.  On November 21, 2021, the Appellate Division, Third Department, denied Petitioner's Motion.  SR 710-11.

## III. PETITION

Petitioner challenges his 2015 judgment of conviction in Albany County, following a jury trial, of Murder in the Second Degree.  *See generally* Pet.; *see also* SR 63, Certificate of Conviction.  Petitioner argues that he is entitled to federal habeas relief

---

[7] A copy of the Court of Appeals' Opinion denying Petitioner's leave application is included in the State Court Records.  *See* SR 656.

[8] Notably, co-defendant Croley's conviction was overturned on direct appeal.  *People v. Croley*, 163 A.D.3d 1056 (3rd Dept. 2018).  There, the Appellate Division reasoned: "Even if we accept that the evidence proved beyond a reasonable doubt that [Petitioner] intentionally caused the victim's death by shooting him and that defendant intentionally aided [Petitioner] in locating and isolating the victim, the evidence does not prove beyond a reasonable doubt that defendant knew—before the shooting occurred—that [Petitioner] planned to kill the victim, because defendant could have had other equally plausible reasons for wanting access to the victim, such as robbery or assault."  However, the state court's conclusion; *i.e.*, that there was not sufficient evidence to establish Croley's intent to kill the victim, is not relevant to Petitioner's conviction because he fired the three fatal gunshots to the victim's leg, torso, and head.

because: (1) he was deprived of the effective assistance of trial and appellate counsel (Pet. at 6-10); (2) his conviction is based on legally insufficient evidence (Pet. at 8); and (3) the A.D.A. committed prosecutorial misconduct during the People's summation (Pet. at 8-9).

In opposition, respondent contends: (1) the Appellate Division reasonably rejected the ineffective assistance claims which Petitioner properly presented, and Petitioner's remaining claims, which are unexhausted, should be dismissed as meritless (Dkt. No. 14-1 at 17-30); (2) habeas review of Petitioner's legal sufficiency claim is procedurally barred and, in any event, the Petitioner's conviction was supported by legally sufficient evidence (Dkt. No. 14-1 at 30-33); and (3) the Appellate Division reasonably rejected Petitioner's prosecutorial misconduct claim (Dkt. No. 14-1 at 33-38).

## IV.   <u>DISCUSSION</u>

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (internal

quotation marks and citation omitted).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

### A.  Ineffective Assistance of Counsel

Petitioner first argues habeas relief is warranted because his trial and appellate counsel provided ineffective assistance.  Pet. at 6-10.  Petitioner avers trial counsel's performance "demonstrated a complete lack of investigation and preparation" and trial counsel failed to:

> challenge the sufficiency of the grand jury[;] . . . properly cross-examine . . . Columbus[;] . . . create an alternative theory that Columbus could have been the shooter[;] . . . properly cross-examine . . . Courtney[;] have the Prosecution's Power Point presentation marked as a trial exhibit, and . . . review it before the [People's] summation[;] . . . object to the numerous improper comments made by the prosecution during summation[;] . . . object to the prosecution[']s improper impeachment of his own witness[;] . . . object when County Court allowed a juror to remain seated after it was discovered the juror had a church relationship with the sister of the victim[;] . . . request that the juror be removed as "Grossly Unqualified[;]" . . . [and move for] a mistrial due to [Albany County Court's] error [in] allowing the Grossly unqualified juror [to remain seated].

Pet. at 6-7.  Additionally, Petitioner argues his *appellate* counsel provided ineffective assistance by failing to argue, on direct appeal, that Petitioner was deprived of effective assistance based on his *trial* counsel's failure to: "remove a seated juror . . . [who] was 'Grossly Unqualified' . . . object when the trial court did not question a spectator who was familiar with [said] juror . . . object to the court[']s decision not to dismiss the juror . . . [or request] a mistrial" based on the trial court's failure to remove the juror. Pet. at 9.

To succeed on a claim of ineffective assistance of counsel, a defendant must prove both that: (1) "counsel's performance was deficient" and (2) counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish that counsel's performance was deficient, "a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688).  To demonstrate counsel's deficient performance prejudiced his defense, "a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105.  When evaluating an ineffective assistance claim on habeas review, "the question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect[,] but whether that determination was unreasonable— a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro*, 550 U.S. at 473) (internal quotations omitted).  Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

### 1.  <u>Failure to Adequately Prepare and Conduct Investigation</u>

Petitioner claims his trial counsel "was ineffective for failing to conduct a proper pre-trial investigation[,]" arguing counsel's performance "demonstrated a complete lack of . . . preparation for" trial.  Pet. at 6.  Petitioner avers counsel's performance "showed that he failed to read the grand jury testimony of" prosecution witnesses "Courtney . . . [and] Columbus" and "failed to review a document showing that witness Columbus deleted 55 calls and texts from his phone that were contemporaneous to the crime." Pet. at 6.[9]

At the hearing conducted on the ineffective assistance claim contained in Petitioner's motion to vacate pursuant to C.P.L. § 440.10, Petitioner's trial counsel testified that he was "sure [he] did" review the documents provided to him by the prosecutor, including transcripts of testimony prosecution witnesses provided to the grand jury, in preparation for Petitioner's jury trial.  Dkt. No. 2-3 at 59.  Defense counsel was also asked about "an email from Christopher Cornell to David Rossi, James Olsen and Josiah Jones" and "a letter from David Rossi to [trial counsel] . . . [d]ated October 28, 2014[.]"  Dkt. No. 2-3 at 54; *see also* SR 502, Email from Christopher Cornell to David Rossi, SR 503-04, Letter from David Rossi to Paul F. Dwyer.

Although the defense counsel did not "specifically" recall having received both documents at the November 8, 2017, hearing, counsel agreed he "may have."  Dkt. No. 2-3 at 54.  Trial counsel also explained, despite his knowledge of Columbus' deleted messages, at trial he strategically declined to pursue questions about those text messages on cross-examination in an effort to persuade the jury that the People had

---

[9] Whether counsel's cross-examinations of prosecution witnesses Courtney and Columbus deprived Petitioner of the effective assistance of counsel is assessed separately below.

not meet their burden because there was no motive for Petitioner to murder Maxim. *See* Dkt. No. 2-2 at 416-19.

Following the hearing, the Albany County Court credited trial counsel's testimony that he had reviewed the materials at issue in preparation for trial, holding Petitioner "failed to . . . establish trial counsel's performance was constitutionally deficient[.]"  SR 500 (citation omitted).  And on Petitioner's consolidated direct appeal, the Appellate Division concluded "County Court properly denied [Petitioner]'s CPL 440.10 motion" because Petitioner "was provided with meaningful representation[.]"  *White-Span*, 182 A.D.3d at 916 (citations omitted).

The state court's decision to credit trial counsel's testimony that he had reviewed discovery documents in preparation for trial is "presumed to be correct" unless rebutted "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also, e.g., Ballard v. Costello*, No. 1:01-CV-1000, 2001 WL 1388297, at *3 (E.D.N.Y. Nov. 2, 2001) (explaining the "state trial court's finding" which credited the testimony of Petitioner's attorney was "entitled to a presumption of correctness, which [the Petitioner] has the burden of rebutting by clear and convincing evidence") (citing *Morris v. Reynolds*, 264 F.3d 38, 47 (2d Cir. 2001)) (additional citation omitted).

Petitioner has not offered any such clear and convincing evidence.  Trial counsel's decision not to advance the line of questioning Petitioner wished to pursue is distinct from the matter of whether counsel adequately prepared for trial by reviewing discovery materials, and Petitioner has failed to rebut the presumption of correctness applicable to the state courts' decision crediting counsel's testimony that he had reviewed the documents at issue.

Moreover, to the extent Petitioner contends trial counsel had not adequately prepared for trial because counsel merely testified he "may have" or "assume[d]" he had received the materials at issue during the C.P.L. § 440 hearing, that argument provides no basis for relief.  As the Second Circuit has explained, "[t]ime inevitably fogs the memory of busy attorneys" therefore, counsel's inability to specifically recall receiving transcripts and communications after multiple years "does not reverse the *Strickland* presumption of effective performance."  *Greiner v. Wells*, 417 F.3d 305, 326 (2d Cir. 2005).

### 2. <u>Failure to Challenge the Sufficiency of the Grand Jury</u>

Petitioner also argues that his trial counsel was ineffective because he "failed to challenge the sufficiency of the grand jury[.]"  Pet. at 7.  Respondent contends this claim is unexhausted, not cognizable, and meritless.  Dkt. No. 14-1 at 30.

This claim also fails.  Irrespective of whether Petitioner properly exhausted his ineffective assistance claim on this basis, and regardless of the claim's merits:

> a petit jury's guilty verdict transforms any defect in the grand jury proceedings into harmless error by establishing both that there was probable cause to indict the defendant and that the defendant was actually guilty beyond a reasonable doubt . . . *Claims of constitutional error arising out of state grand jury proceedings are . . . not cognizable for federal habeas corpus review*.

*Beverly v. Walker*, 899 F. Supp. 900, 908 (N.D.N.Y. 1995) (first citing *United States v. Mechanik*, 475 U.S. 66, 70 (1986); then citing *Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989)) (emphasis added), *aff'd*, 118 F.3d 900 (2d Cir. 1997)).  "It necessarily follows as a matter of law that [Petitioner] cannot establish that any errors made by his trial

counsel with respect to the grand jury proceeding prejudiced him[.]"  *Velez v. People of State of N.Y.*, 941 F. Supp. 300, 316 (E.D.N.Y. 1996).

In sum, "[t]here is no federally cognizable ineffective assistance claim concerning advice regarding the state grand jury process."  *Montalvo v. Annetts*, No. 1:02-CV-1056, 2003 WL 22962504, at *24 (S.D.N.Y. Dec. 17, 2003) (citing *Davis v. Mantello*, 42 Fed. Appx. 488, 491 n. 1 (2d Cir. 2002), *cert. denied*, 538 U.S. 986 (2003)) (additional citations omitted).

Because Petitioner's ineffective assistance claim based on counsel's failure to challenge the sufficiency of the grand jury proceedings presents no basis upon which federal relief could be granted, it must be denied regardless of whether Petitioner properly presented it to the state courts.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

### 3.  Failure to Provide Petitioner the Grand Jury Minutes

Petitioner next claims that his trial counsel was ineffective because "[h]e failed to give the Petitioner a copy of the grand jury minutes."  Pet. at 6.  Petitioner argues that, had counsel furnished him with a copy of the transcript, "it would have provided an opportunity for Petitioner to review testimony of witnesses and would have afforded him a more significant role in the course of trial preparation and in the trial itself as he would have been able to discuss strategy in a more informed manner.  Traverse at 10. Respondent contends Petitioner was not prejudiced by trial counsel's failure to provide him a copy of the grand minutes; therefore, counsel's omission did not amount to ineffective assistance.  Dkt. No. 14-1 at 22.

Even assuming, *arguendo*, trial counsel's failure to furnish Petitioner with a transcript of the testimony presented to the Grand Jury "fell below an objective standard of reasonableness[,]" that Petitioner "would have been able to discuss strategy in a more well informed manner" had he possessed a copy of the Grand Jury minutes is insufficient to demonstrate prejudice under *Strickland*.

Because Petitioner has failed to allege, much less "show that there is a reasonable probability that, but for counsel's" failure to provide Petitioner a copy of the Grand Jury minutes, "the result of the proceeding would have been different[,]" the state court's denial of Petitioner's ineffective assistance claim on this basis was not unreasonable.  *See Strickland*, 466 U.S. at 694.

### 4. <u>Failure to Properly Cross-Examine Columbus</u>

Next, Petitioner avers he was deprived of the effective assistance of counsel because his trial counsel "failed to properly cross-examine the on the scene witness, Donald Columbus, after receiving *Brady* material that showed [Columbus] deleted 55 calls and text messages that occurred immediately around the time of the murder."  Pet. at 7.  Respondent avers the state courts' denial of Petitioner's ineffective assistance claim on this basis was not unreasonable.  Dkt. No. 14-1 at 23-24.

During the C.P.L. § 440 hearing, trial counsel was asked about "a letter from David Rossi to [counsel] . . . regarding discovery matters in [Petitioner]'s case[.]"  Dkt. No. 2-3 at 54-56; *see also* SR 503-04, Letter from David Rossi to Paul F. Dwyer.  The letter explains Det. Olsen interviewed witness Donald Columbus "[i]n the early stages of the investigation . . . [and, a]t that time, he was shown Mr. Columbus' phone which Det. Olsen states appeared to contain text messages during the late hours of October 18[th],

and early morning hours of October 19th" but the "phone was not taken as evidence at that time" and, "[o]n a subsequent date, the phone was turned over to police and appeared to not contain any text messages from those hours[.]"  SR 503.

Defense counsel also referred to an email which Detective Cornell had sent to the prosecutor and others, which stated there were "55 calls that [we]re present in Columbus['] phone records that [we]re not in his cellular telephone" which had been "made in between 10/19/2013 0009-1032 a.m.[,]" including "23 outgoing calls and 22 incoming calls" in addition to "five text[]" messages.  SR 502, Email from Christopher Cornell to David Rossi; *see also* Dkt. No. 2-3 at 54-56.

When asked why he had not cross-examined Columbus about the text messages, defense counsel explained that "one of the best strengths" of Petitioner's case was the People's inability to prove any "motivation" to commit the charged murder, but that "the prosecution definitely had a theory about the motivation which . . . Rossi put in th[e aforementioned] discovery letter[.]"  Dkt. No. 2-3 at 63.

In another portion of the A.D.A.'s discovery letter, the prosecutor stated he had met with an individual who "was incarcerated at the time of [Maxim's] murder" and told the A.D.A. "that a few days after the murder, another inmate told him that he was friends with Maxim and was at the bar with him just before he was killed . . . [and] that [Maxim] was a 'sneak thief' which meant he would steal stashes of drugs and money[.]"  SR 504.

The prosecutor's letter further stated "[t]he inmate believed that he stole that money and was flaunting it around and someone killed him or had him killed because of it" and, while the inmate who spoke to the A.D.A. had no personal knowledge of the

facts of the case, "this rumor ha[d] some similarities to a statement provided by a[nother] witness" which had previously been disclosed to defense counsel.  SR 504.

Petitioner's trial counsel explained he declined to ask Columbus about the deleted text messages, despite Columbus' proximity to the murder, because "[t]he fear was that it would open the door to evidence of drug dealing"– Dkt. No. 2-2 at 418 –and "[t]here was other evidence that was at play that [Petitioner's attorney] and the other defense lawyer made some repeated efforts and were successful in keeping out of the view of the jury" including "a website . . . or a video of some sort which" could have implicated Petitioner in drug dealing.  Dkt. No. 2-3 at 63.

Counsel elaborated that opening the door to such evidence would be prejudicial with "[o]ne [effect] being the prejudicial effect of drug dealing, [and] the other being the highly prejudicial effect of a motive coming out."  Dkt. No. 2-3 at 63.  Accordingly, Petitioner's attorney acknowledged that he "made [a] conscious effort to ensure that the jury did not hear about" evidence which could have led the jury to believe Petitioner was involved with drug dealing because counsel "knew that evidence of drug dealing and possible evidence of motive would be highly prejudicial and damaging to the defense case."  Dkt. No. 2-3 at 63-65.

In its Decision and Order denying Petitioner's motion to vacate, the Albany County Court explained Petitioner failed to demonstrate the absence of strategic or other legitimate explanations for counsel's "failure to cross-examine . . . Columbus about the deletion of 55 calls from his cell phone."  SR 499-500.

The Third Department similarly rejected Petitioner's ineffective assistance claim, explaining Petitioner "failed to establish the absence of strategic reasons for failing to"

cross-examine Columbus about the deleted phone calls and text messages and, instead, "focus on the lack of direct evidence against [Petitioner]." *White-Span*, 182 A.D.3d at 915-16.

Upon review, Petitioner has failed to demonstrate the state courts' application of *Strickland* was unreasonable. As the Second Circuit has explained, counsel's decisions about "whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature." *United States v. Nersesian*, 824 F.2d 1294, 321 (2d. Cir. 1987), *cert. denied*, 484 U.S. 958 (1987); *see also United States ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir. 1974) ("the decision to call or bypass particular witnesses is peculiarly a question of trial strategy . . . which courts will practically never second-guess.") (first citing *United States v. Matalon*, 445 F.2d 1215, 1219 (2d Cir. 1971), *cert. denied*, 404 U.S. 853 (1971); then citing *United States v. Garguilo*, 324 F.2d 795, 797 (2d Cir. 1963)), *cert. denied*, 417 U.S. 972 (1974).

Such "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690. Moreover, neither Petitioner's disagreement with counsel's strategic decision nor that the strategy utilized was unsuccessful are sufficient to prove counsel was ineffective. *See Lalonde v. Thomas*, No. 9:20-CV-1561 (GTS), 2022 WL 1303918, at *19 (N.D.N.Y. May 2, 2022) ("While a petitioner may disagree with trial counsel's strategy, counsel is not ineffective merely because a strategy he/she employed was unsuccessful.") (collecting cases); *Backus v. Nichols*, No. 9:04-CV-0356 (TJM/GHL), 2008 WL 413295, at *12 (N.D.N.Y. Feb. 13, 2008) ("[t]o the extent [the petitioner]'s claim suggests a disagreement with counsel's strategy, '[a] petitioner cannot prevail on

a claim of ineffective assistance merely because he disagrees with his counsel's strategy.'") (quoting *Bussey v. Greiner*, No. 1:02-CV-8642, 2007 WL 2589454, at *8 (S.D.N.Y. Aug. 28, 2007)) (additional citation omitted).

There is no reason to second-guess trial counsel's strategic decision not to cross-examine Columbus about his deleted phone calls and text messages to eliminate the risk of opening the door to other evidence which would have been prejudicial to Petitioner's case. *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (when "assessing [counsel's] performance, we . . . will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a 'significant potential downside.'") (quoting *Sacco v. Cooksey*, 214 F.3d 270, 275 (2d Cir. 2000)).

As Petitioner's trial counsel explained, inquiring into why Columbus deleted information about incoming and outgoing calls and text messages from the night of Maxim's death could have opened the door to information which he and the co-defendant's counsel successfully suppressed; *i.e.*, precluded the jury from learning. By forgoing this line of questioning, counsel not only suppressed prejudicial information which could have implicated Petitioner in drug dealing, but also preserved Petitioner's ability to argue the prosecution presented no motive, consistent with counsel's apparent strategy of attacking the circumstantial nature of the People's case.

Accordingly, the Appellate Division's denial of Petitioner's ineffective assistance claim based on trial counsel's strategic decision was not unreasonable. *Whiting v. La Clair*, No. 1:09-CV-1903, 2012 WL 3930401, at *7 (E.D.N.Y. Sept. 7, 2012) (concluding the state court's denial of the Petitioner's ineffective assistance claim was not unreasonable where trial counsel "made a strategic decision not to call [a witness] . . .

because it would open the door to potentially damaging information on cross-examination" finding trial counsel's "decision was reasonable . . . [and] grounded in some strategy that advance[d] the client's interests'") (quoting *Eze v. Senkowski*, 321 F.3d 110, 120 (2d Cir. 2003)); *see also*, *e.g.*, *United States v. Morin*, No. 8:10-CR-0506 (TJM), 2015 WL 12670506, at *3 (N.D.N.Y. Aug. 18, 2015) (counsel was not ineffective for failing to raise an entrapment defense, because the assertion of such a defense would have "open[ed] the door to other evidence") (citing *United States v. Fadel*, 844 F.2d 1425, 1433 (2d Cir. 1988)); *Lee v. United States*, No. 1:17-CV-08567, 2023 WL 5509046, at *11 (S.D.N.Y. Aug. 25, 2023) ("the decision not to pursue potentially damaging testimony is a reasonable strategic decision that advances the client's interests . . . [therefore, c]ounsel's decision to discontinue a potentially damaging line of questioning was objectively reasonable.") (internal quotations and citations omitted).

### 5.  Failure to Present an Alternate Theory

Petitioner similarly contends that his trial counsel was ineffective because "[h]e failed to create an alternate theory that Columbus could have been the shooter based on the credible evidence presented at trial through testimony."  Pet. at 7.  On direct appeal, the Appellate Division concluded, "[w]ith respect to [Petitioner']s claim that counsel was ineffective for failing to advance the theory that Columbus was the shooter . . . [Petitioner] failed to establish the absence of strategic reasons for failing to do so."  *White-Span*, 182 A.D.3d at 915.  Respondent avers the Third Department's application of *Strickland* to Petitioner's claim was not unreasonable.  Dkt. No. 14-1 at 22-23.

"Generally, the decision whether to pursue a particular defense is a tactical choice which does not rise to the level of a constitutional violation . . . [and a] habeas

court will not second-guess trial strategy[.]"  *Campbell v. Greene*, 440 F. Supp. 2d 125,

150 (N.D.N.Y. 2006) (quoting *Nieves v. Kelly*, 990 F. Supp. 255, 264 (S.D.N.Y. 1997));

Here, counsel's refusal to explicitly assert Columbus was the person who shot Maxim

was such a tactical choice.[10]

Had counsel directly asserted that Columbus had shot Maxim, the defense would

have faced an unnecessary burden.  *See United States v. Quashie*, No. 18-CV-3740,

2018 WL 5113136, at *5 (E.D.N.Y. Oct. 19, 2018) (explaining the argument that defense

counsel "should have more positively asserted that the robber was [a specific

individual], instead of merely identifying the possibility . . . would have been an unsound

trial strategy" because "[t]o more affirmatively state that [the specific individual] was in

fact the third robber would have taken on a burden that defendant did not have.").

---

[10] While Petitioner's counsel did not positively assert Columbus was the shooter as Petitioner contends counsel should have, during his cross-examination of Jordan, defense counsel asked Jordan about an encounter with Columbus following the shooting as follows:

| | |
|---|---|
| [Counsel]: | And then you and [Otero] put [Maxim] in [Otero]'s car, is that correct? |
| [Jordan]: | Yes, sir. |
| [Counsel]: | And I think your testimony is he headed to the hospital but you stopped and jumped out of the car when you saw [Columbus], is that right? |
| [Jordan]: | Yes, sir. |
| [Counsel]: | Did you have a conversation with [Columbus]? |
| [Jordan]: | Yes, sir. |
| [Counsel]: | What did you say to [Columbus]? |
| [Jordan]: | I said what the fuck happened? You know, what was going on? Who has something to do with this? |
| [Counsel]: | I'm sorry. I didn't hear that. |
| [Jordan]: | I said what happened? What the fuck happened? You got something to do with this? |
| [Counsel]: | You said, you had something to do with this? What did he say? |
| [Jordan]: | He said, no, I don't know what happened. I just heard gunshots and ran like you. |

T 849-50.  Therefore, while Petitioner's assertion that defense counsel did not explicitly argue Columbus murdered Maxim is accurate, counsel did elicit testimony about Jordan's reaction to the shooting, specifically his concern about Columbus.

Specifically, if trial counsel had taken Petitioner's choice of approach, counsel would have invited the jury to compare the credibility of the People's theory– that Petitioner killed Maxim –with the defense's.  While testimony established Columbus was present on Cortland Place at the time of Maxim's death, there was also evidence which may have led jurors to find Petitioner's theory unpersuasive.  Columbus testified he had been friends with Maxim and had spent the night with Maxim, as confirmed by Johnson, who had been friends with Maxim for ten years.  *See* T 474; T 577.

In the moments prior to Maxim's death, Wittingham and Jordan testified they had a conversation with Columbus and Maxim outside Willies bar.  *See* T 461-62; 844-45. By contrast, an individual matching Petitioner's description was recorded on surveillance video "mak[ing] several passes ack and forth" outside Willies and phone record evidence supported the People's theory that Petitioner was communicating with Croley inside of the bar where Maxim was located.  *See* T 682.

As Petitioner has identified, Columbus testified that he "went to [his] car" as Maxim continued speaking to Jordan and Detective Behrens concluded "the door" of Columbus' vehicle "was open at the time of the incident" based on the trajectory of the projectile; therefore, trial counsel *could* have argued Columbus retrieved a weapon from the vehicle then shot Maxim.  *See* T 478; T 655.  However, the existence of facts which rendered Petitioner's alternate theory possible did not require counsel to make such an argument.

Trial counsel may well have decided that arguing Columbus retrieved a weapon from his car and then fired shots at both Maxim and his own vehicle would have been unsuccessful.  *See*, *e.g.*, *Smalls v. McGinnis*, No. 1:04-CV-0301, 2004 WL 1774578, at

*22 (S.D.N.Y. Aug. 10, 2004) (rejecting the petitioner's claim "that nearly every possible argument attacking the evidence should have been made in his counsel's summation" because "a defense attorney is not required to rehash every fact or argument in his summation, and is presumed to make 'strategic choices.'") (quoting *Strickland*, 466 U.S. at 690-91); *Santana v. Comm'r of Corr. Servs.*, No. 1:02-CV-3700, 2003 WL 21459569, at *2 (S.D.N.Y. June 24, 2003) (explaining "[c]ounsel need not pursue every possible argument, and may make reasonable decisions about which arguments present the strongest chance of success.") (citing *Jones v. Barnes*, 463 U.S. 745, 754 (1983)).

Moreover, while Columbus testified that he "ran" when he heard gunshots, *see* T 478, he was present as Jordan and Otero lifted Maxim into Otero's car to go to the hospital.  *See* T 481-82; *see also* T 849-50.  Later that day, Johnson testified he went to the hospital, which was confirmed by, *inter alia*, the testimony of Maxim's cousin Otero. *See* T 483; T 514-20.  By comparison, testimony, video, phone records, and DNA evidence supported the People's theory that Petitioner traveled east on Washington Avenue away from Cortland Place, then north on North Lake Street, while communicating with Croley.

In sum, trial counsel's decision not to direct the jury to compare a theory that Columbus shot Maxim with the People's theory of the case was not unreasonable.

### 6.  Failure to Properly Cross-Examine Courtney

Petitioner next contends trial counsel provided ineffective assistance because "[h]e failed to properly cross-examine the witness Huie Courtney in regards to the man that [Courtney] observed running away from the scene of the crime, whose actions were outright suspicious[.]"  Pet. at 7.

The Appellate Division rejected this argument, explaining:

> Courtney was cross-examined extensively about his
> observations related to the shooting . . . counsel challenged
> Courtney's testimony that he saw no one other than
> [Petitioner] running toward him from the scene of the shooting
> and persisted in questioning Courtney as to whether other
> individuals were in the vicinity of where he saw [Petitioner].

*White-Span*, 182 A.D.3d at 915.  Respondent argues the Third Department's denial of

Petitioner's ineffective assistance claim on this basis was not unreasonable.  Dkt. No.

14-1 at 20-22.

In his Grand Jury testimony, Courtney testified he was walking south on North

Lake Street towards Washington Avenue and, as he walked along the side of a bar,

heard multiple shots.  SR 398-99.  Courtney recalled observing two individuals shortly

thereafter, one who was "tall, about six foot, slim, short hair, black, [with] like dark-

colored attire on, like a bubble coat and a dark-colored hoodie" and another who "was

short, dark-skinned, shoulder length dreads . . . [wearing] a dark-colored hoodie . . .

[with] either white or yellow letters on it . . . [and] dark-colored pants."  SR 399-400.

Courtney testified that the individual he described as "tall" ran from Cortland

Place west down Washington Avenue while the shorter individual ran east down

Washington Avenue from Cortland Place.  SR 399-400.  Courtney told the Grand Jury

that the shorter individual traveling east on Washington Avenue pulled his hood back as

he walked and a "stocking cap" fell behind him.  SR 400-01.  Courtney stated he passed

the individual as they each crossed Washington Avenue, near the center of the road,

then the individual continued "onto North Lake Street, going toward Central Avenue."

SR 400.

Courtney continued walking west on Washington Avenue and observed "the person laying in the street . . . bleeding from the head" and two others "near the body . . . saying, 'Get him in the car. Get him in the car.'"  SR 396.  Courtney walked faster, continuing west on Washington Avenue, until he reached Quail Street, where he saw "the taller gentleman" was "by the Laundromat . . . catching his breath[.]"  SR 396-97.  Courtney explained "he was kneeling down" with his "hands on his knees" until he "started running again" southbound on Quail Street.  SR 402.

At trial, Courtney testified on direct examination that he walked along the side of the "Smokin' Bull" bar, turned onto Washington Avenue, and heard shots coming from Cortland Place.  T 528-29.  Courtney recalled he observed a "short black male with shoulder-length dreads" wearing "dark-colored clothing" with lettering on the shirt "take his hood off" and "a skull cap or a du-rag fell off" as the man passed Courtney.  T 529-30.  Courtney also told the jury he had "seen another gentleman running the opposite way[,]" a "tall, dark skinned" man wearing "dark clothes[.]"  T 530.

On cross-examination, Petitioner's attorney asked Courtney about the individual matching Petitioner's description who had walked past Courtney on Washington Avenue.  T 535.  Following counsel's questions, Courtney agreed the individual was "walking . . . at a high pace" rather than jogging or running.  T 535.

Courtney confirmed, in response to counsel's questions, that he did not see the individual carrying any weapon or gun.  T 538.  Courtney also agreed, in addition to that individual, "the one person that was going the other way[,] and the two people" on Cortland Place, there were other people "milling around" in the space outside of Willies bar.  T 537-38.

"Courts are reluctant to find unreasonable conduct in defense counsel's cross-examination strategy absent grave error falling below the required professional standard." *Salcedo v. Artuz*, 107 F. Supp. 2d 405, 417–18 (S.D.N.Y. 2000); *see also Wynn v. Lee*, No. 9:19-CV-0209 (BKS/CFH), 2022 WL 19405961, at *18 (N.D.N.Y. Dec. 12, 2022) ("cross examination is a trial strategy that is not intended to be second guessed by habeas review.") (collecting cases), *report and recommendation adopted*, 2023 WL 2364875 (N.D.N.Y. Mar. 6, 2023).

Upon review, defense counsel's failure to further inquire into the other individuals Courtney recalled observing on Washington Avenue was not a "grave error."  First, counsel strategically elicited testimony from Courtney which was favorable to Petitioner's defense.  Defense counsel established the individual matching Petitioner's description did not appear to be holding a weapon as he traveled from the intersection of Cortland Place and Washington towards North Lake Street.  *See* T 538.

Additionally, while defense counsel did not further inquire into the individual going west on Washington Avenue, counsel's cross-examination established there were multiple other individuals outside establishments on Washington Avenue around the time the individual matching Petitioner's description passed the witness.  *See* T 537-38.

Rather than bolstering the prosecution's theory that the shooter fled north on Cortland Place to Washington Avenue, defense counsel strategically argued in summation that the person who shot Maxim may have fled south on Cortland Place towards Western Avenue.  *See* T 927-28 (counsel arguing "[t]here's no apparent police activity . . . south on Cortland even though, as one of the officers admitted to me, if somebody was committing a murder on Cortland, Washington is all brightly lit [with] tons

of activity and tons of people running around" but "going towards Western on Cortland, which is south, it's dark and there's no one there" and asking the jury to consider "did someone commit this murder and go south on Cortland towards Western[] into the dark where there[ was] basically no investigation done[?].").[11]

Therefore, counsel's decision to elicit from Courtney that there were individuals other than Petitioner outside on Washington Avenue following the sound of gunshots *without* further directing the jury's attention to a specific individual observed by the witness was not unreasonable.

### 7.  Failure to Review and Have the People's Presentation Marked

Petitioner avers that his trial counsel's performance was also deficient because "[h]e failed to have the Prosecution's Power Point presentation marked as a trial exhibit, and failed to review it before the summation[.]"  Pet. at 7.[12]  Respondent contends the PowerPoint presentation was not objectionable and Petitioner is unable to demonstrate that he was prejudiced by trial counsel's failure to have the People's presentation marked as an exhibit because a copy of the demonstrative was included in the record on appeal.  Dkt. No. 14-1 at 25; *see also* SR 287-324, Printout of the People's PowerPoint Presentation.

Petitioner's claim that trial counsel should have objected to the prosecutor's use of "doctored footage" must be rejected.  *See* Traverse at 10-11.  New York's highest

---

[11] *See also* T 728-29 (Petitioner's attorney inquiring, during the cross-examination of Detective Cornell, as to investigation conducted on "Cortland south of where Spring comes into Cortland" and Cornell agreeing with defense counsel's conclusion that "Washington was a brightly-lit area" where "a lot more activity" occurred than in the areas located to the south).

[12] In his Traverse, Petitioner clarifies that "[b]y failing to review the PowerPoint, [trial counsel] allowed the jury to see 'evidence' that had been doctored and manipulated to fit the prosecution's theory [and, if counsel] . . . ha[d] reviewed it[,] he could have objected to certain things or" requested Albany County Court conduct "a hearing on it so the court c[ould] rule on its legality." Traverse at 11.

court has explained "[t]here is no inherent problem with the use of a PowerPoint presentation as a visual aid in connection with closing arguments" so long any "superimpose[d] commentary" and/or "annotations . . . accurately represent the trial evidence[.]"  *People v. Williams*, 29 N.Y.3d 84, 89 (2017) (citing *People v. Santiago*, 22 N.Y.3d 740, 751 (2014)).

Therefore, the prosecutor's presentation of videos and photos on summation with added "circle" annotations and time stamps to reflect the time as corrected by witness testimony was not improper.  *See People v. Santana*, 209 A.D.3d 566, 567 (1st Dept. 2022) (explaining "[a] PowerPoint presentation may be used as a visual aid in connection with closing arguments, provided that what is displayed would likewise be proper to present in the form of an oral statement[.]") (citing *Williams*, 29 N.Y.3d at 89; *People v. Anderson*, 29 N.Y.3d 69, 72 (2017), *cert denied*, 583 U.S. 977 (2017)), *leave denied*, 39 N.Y.3d 988 (2022); *see also, e.g.*, *Clarke v. Poole*, No. 9:05-CV-1411 (GTS/RFT), 2009 WL 2922314, at *15 (N.D.N.Y. Sept. 8, 2009) ("[g]iven the rule in New York that exclusion of demonstrative evidence 'rests largely with the discretion of the trial court,' . . . counsel's failure to" argue the prosecutor's demonstration was prejudicial "was not objectively unreasonable.") (citation omitted).

Further, as explained in greater detail below, the prosecutor's comments about inferences supported by the video footage in combination with other evidence constituted fair comment on the evidence presented.  In sum, Petitioner has failed to demonstrate the prosecutor's use of visual aids during summation was improper, much less that, but for trial counsel's failure to object to the presentation, the result of his trial would have been different.

### 8.  Failure to Object to the Prosecutor's Summation

Next, Petitioner avers that his trial counsel was ineffective because "[h]e failed to object to the numerous improper comments made by the prosecution during summation."  Pet. at 7.  The Third Department rejected this claim, finding that "the prosecutor's summation was proper and fair comment on the evidence."  *White-Span*, 182 A.D.3d at 916.  Respondent contends that the state court's decision was not unreasonable.  Dkt. No. 14-1 at 25.

As explained in greater detail below in connection with Petitioner's claim of prosecutorial misconduct, the People's summation constituted fair comment on the evidence presented at trial.  Counsel's failure to make a meritless objection cannot constitute ineffective assistance.  *See United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999) ("Failure to make a meritless argument does not amount to ineffective assistance.") (citing *Strickland*, 466 U.S. at 687-96).  Therefore, the Appellate Division's denial of Petitioner's ineffective assistance claim on this basis was not unreasonable.

### 9.  Failure to Object to the Prosecutor's Cross-Examination

Petitioner further avers that his trial counsel "failed to object to the prosecution[']s improper impeachment of his own witness."  Pet. at 7.  But the petition is devoid of any explanation as to which witness was improperly impeached, why such impeachment was improper or how defense counsel's failure to object to the prosecutor's impeachment prejudiced Petitioner's defense.  *See* Pet. at 7; Traverse at 8-15.[13]

---

[13] In his counseled brief to the Appellate Division, Petitioner averred: "Columbus was untruthful and evasive as to whether he had driven his car to Willie's that evening. It was an unassailable fact that he drove . . . Yet, Columbus testified that he could not recall. Without objection, the prosecutor impeached Columbus with his grand jury testimony."  SR 536.  However, when the prosecutor apparently directed Columbus to his prior testimony, Croley's defense attorney objected that the prosecutor "ha[dn't] made any showing of the necessity to lead the witness" and Petitioner's counsel joined in that objection.  *See* T

"It is well-settled in this Circuit that vague and conclusory allegations that are unsupported by specific factual averments are insufficient to state a viable claim for habeas relief . . . [therefore,] a claim of ineffective assistance must contain specific factual contentions regarding how counsel was ineffective."  *Kimbrough v. Bradt*, 949 F. Supp. 2d 341, 355 (N.D.N.Y. 2013) (collecting cases).

Therefore, Petitioner's claim that trial counsel failed to object to the impeachment of a witness– without specifying which witness or how, but for defense counsel's failure to object to such impeachment, the result of the proceeding would have been different – does not warrant federal habeas relief.  *See*, *e.g.*, *Hartley v. Senkowski*, No. 1:90-CV-0395, 1992 WL 58766, at *2 (E.D.N.Y. Mar. 18, 1992) (explaining "petitioner's vague and conclusory allegations that counsel did not prepare for trial or object to errors carry very little weight.").

**10.** **Failure to Remove, Object to, or Seek a Mistrial Due to A "Grossly Unqualified" Juror and Failure to Include Meritorious Claims on Direct Appeal**

Finally, Petitioner averred he was denied the effective assistance of counsel because trial counsel:

> [F]ailed to[:] object when County Court allowed a juror to remain seated after it was discovered the juror had a church relationship with the sister of the victim[;] . . . request that the juror be removed as "Grossly Unqualified" due to an implied bias[; and] . . . move the court [for] a mistrial due to the mode of proceedings error by allowing the Grossly unqualified juror.

Pet. at 7.  Similarly, Petitioner asserted "[a]ppellate counsel failed to raise two meritorious issues on appeal, namely that [the] trial court failed to remove a seated juror

---

475-76.  Additionally, following an off the record discussion, Albany County Court overruled the defense objection.  *Id*.

after it was presented that she was 'Grossly Unqualified' [and] . . . that trial counsel was ineffective for failing to" take the aforementioned actions with respect to said juror.  Pet. at 9.  In his Traverse, however, "Petitioner respectfully request[ed] to have the issues pertaining to juror number 4 withdrawn from the Petition[.]"  Traverse at 23.

In sum, Petitioner has failed to demonstrate the Appellate Division's application of *Strickland* was unreasonable.  Accordingly, Petitioner's ineffective assistance claims are dismissed.

### B.  Legal Sufficiency

Petitioner next contends that his conviction of Murder in the Second Degree is unsupported by legally sufficient evidence.  *See* Pet. at 8.  Respondent avers Petitioner's legal sufficiency claim is barred from habeas review on independent and adequate state law grounds and, in any event, is meritless.  *See* Dkt. No. 14-1 at 31-33.

"A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Walker v. Martin*, 562 U.S. 307, 315 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 55 (2009)) (internal quotations and additional citations omitted).  "This rule applies whether the state law ground is substantive or procedural."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citation omitted).[14]

---

[14] Furthermore, "even when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted."  *Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 725 (2d Cir. 1996)); *see also Hughes v. Sheahan*, 312 F. Supp. 3d 306, 340 (N.D.N.Y. 2018) (explaining "[e]ven if the state court considers the merits of an otherwise precluded claim, its reliance on a procedural ground as one basis for the denial of the claim precludes federal habeas review.") (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)) (additional citation omitted).

Petitioner argues the evidence supporting his conviction was "legally insufficient" because the People's "entire case was circumstantial. There was no murder weapon . . . There was no eyewitness to the murder [and] . . . There was also no motive presented to the jury." Pet. at 8.[15]  On direct appeal, the Third Department held that because "[Petitioner']s motion for a trial order of dismissal . . . 'was not directed at the specific arguments he raise[d] on appeal, [his] legal sufficiency claim [wa]s unpreserved[.]'" *White-Span*, 182 A.D.3d at 910 (quoting *People v Shackelton*, 177 A.D.3d 1163, 1165 (3rd  Dept. 2019), *lv. denied*, 34 N.Y.3d 1162 (2020); then citing *People v. Gray*, 86 N.Y.2d 10, 19-20 (1995)) (additional citation omitted).[16] [17]

Federal habeas corpus review of Petitioner's legal sufficiency claim will be barred if the Appellate Division's reliance on New York's preservation rule to deny Petitioner's

---

[15] Petitioner's legal sufficiency argument is the same that appellate counsel made to the Third Department on direct appeal.  *See* SR 574-76 (arguing the evidence supporting Petitioner's conviction was legally insufficient because "the circumstantial evidence offered by the prosecution was of no value" and, alternatively, Petitioner's "conviction was against the weight of the evidence" noting "[t]he prosecution did not have a murder weapon, eye-witness, or a motive.").

[16] *See* T 888-89 (at the conclusion of the People's evidence, Petitioner's counsel "move[d] for a trial order of dismissal based on the fact that there [wa]s a complete lack of evidence of the elements of [the charged] crime beyond a reasonable doubt"); 903-04 (defense counsel "renew[ed Petitioner's] motion" after the defense rested their case "for the reasons stated on the record.").

[17] While the Appellate Division concluded Petitioner's legal sufficiency claim was "unpreserved[,]" the state court found the jury's verdict was "supported by the weight of the evidence[,] explaining:

> The surveillance videos support the jury's conclusion that [Petitioner] was the shooter. The video from the bar shows that Croley arrived back at the bar and was frisked upon entering at approximately 2:39 a.m., and [Petitioner] is seen pacing back and forth in front of the bar but did not enter, presumably to avoid being frisked. A permissible inference to be drawn from the video is that, as the People alleged, [Petitioner] was armed with a concealed weapon that would have been discovered had he entered the bar. In addition, [Petitioner] is seen following the victim when the victim left the bar. The jury also heard testimony that a "do-rag" with [Petitioner']s DNA was found near the scene of the shooting, and two witnesses described observing [Petitioner] running from the direction of where the shooting occurred at a pace that indicated he was fleeing the scene.

*White-Span*, 182 A.D.3d at 913.

claim on direct appeal was both "independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729 (1991).

The Second Circuit has explained that New York's preservation rule "is a state law ground . . . independent of any federal question[.]" *Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007). Accordingly, the Third Department's application of the preservation rule was independent of the question presented here, *i.e.*, whether "any rational trier of fact could have found the essential elements of" Murder in the Second Degree "beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (explaining the standard under which federal courts must assess the legal sufficiency of the evidence supporting a criminal conviction).

"To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" *Walker*, 562 U.S. at 316 (citation omitted). Courts in this circuit have consistently found New York's preservation rule to be "firmly established and regularly followed." *See Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) (collecting cases); *see also*, *e.g.*, *Parker v. Ercole*, 666 F.3d 830, 833-34 (2d Cir. 2012) (explaining federal habeas review of the petitioner's claim that the evidence supporting his conviction was "insufficient to support the jury's verdict" was "procedurally barred" where, on direct appeal, "[t]he Appellate Division found that [the petitioner']s sufficiency claim was unpreserved because his counsel had only generally moved to dismiss the charges at the close of the State's case.").

Upon review, the Appellate Division's denial of Petitioner's legal sufficiency claim on the basis that such claim was not preserved as required by New York law constitutes an independent and adequate state law ground precluding habeas review. *See*, *e.g.*,

*Weathers v. Conway*, No. 1:05-CV-0139, 2007 WL 2344858, at *8 (W.D.N.Y. Aug. 15, 2007) (the state court's conclusion, on direct appeal, that the petitioner "did not preserve for [appellate] review [his] contention that the evidence of a robbery was legally insufficient . . . rested on a state law ground . . . independent of the federal question raised and adequate to support the judgment" where "[a]t the close of the prosecution's case, defense counsel 'move[d] to dismiss the people's case on the grounds they ha[d]n't met their burden'" because "[u]nder caselaw applying New York's contemporaneous objection rule, this generalized motion was not sufficient to preserve a specific objection to the legal sufficiency of evidence of a robbery.") (additional quotations and citations omitted); *Mesko v. Lilley*, No. 9:18-CV-0872 (GTS), 2019 WL 6493976, at *5 (N.D.N.Y. Dec. 3, 2019) (concluding the Appellate Division's finding that the petitioner's legal sufficiency claim was unpreserved constituted "an independent and adequate state ground" precluding federal habeas review).[18]

Where, as here, "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," he may avoid the procedural bar if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.

---

[18] *See also*, *e.g.*, *Ibarra v. Burge*, No. 1:02-CV-0825, 2002 WL 1467756, at *3 (S.D.N.Y. July 9, 2002) ("It is black letter law in New York that a defendant's trial motion to dismiss for insufficiency of the evidence must be 'specifically directed' at the alleged error to be preserved for appellate review.") (citing *People v. Cona*, 49 N.Y.2d 26, 33 n. 2 (1979)) (additional citations omitted); *Folkes v. Lee*, No. 1:10-CV-5416, 2011 WL 2610496, at *2 (E.D.N.Y. June 30, 2011) ("It is well settled under New York law that a general objection to the sufficiency of the evidence does not preserve particular theories of inadequacy for appeal.") (citing *People v. Carncross*, 14 N.Y.3d 319, 324-25 (2010); *People v. Hawkins*, 11 N.Y.3d 484, 492 (2008)).

Liberally construed, Petitioner's Traverse avers the ineffective assistance of his trial counsel caused the procedural default of his claim. *See* Traverse at 20 ("Petitioner requests that this court reviews" his legal sufficiency claim "on its merits . . . due to trial counsel's [sic] accumulative actions which rendered his performance ineffective which also involves his failure to properly preserve the legal sufficiency in respect to his identification as the shooter.").

However, "attorney error is an objective external factor providing cause for excusing a procedural default only if that error amounted to a deprivation of the constitutional right to counsel." *Davila v. Davis*, 582 U.S. 521, 528 (2017) (citing *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)). Therefore, Petitioner must demonstrate his attorney's failure to properly preserve his challenge to the sufficiency of the evidence fell below an objective standard of reasonableness and, but for counsel's failure to preserve the argument, the outcome would have been different.

The constitutional standard for challenges to the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). In making this determination, "pieces of evidence must be viewed not in isolation but in conjunction." *United States v. Brown*, 776 F.2d 397, 403 (2d Cir. 1985) (quoting *United States v. Geaney*, 417 F.2d 1116, 1121 (2 Cir.1969), *cert. denied*, 397 U.S. 1028 (1970)).

Additionally, "the reviewing court must draw all reasonable inferences and resolve all issues of credibility in favor of the verdict." *United States v. Zabare*, 871 F.2d 282, 286 (2d Cir. 1989) (citation omitted). Therefore, "we must credit every inference

that could have been drawn in the government's favor[.]"  *United States v. Villegas*, 899 F.2d 1324, 1339 (2d Cir. 1990) (citation omitted); *see also Lane v. Graham*, No. 9:14-CV-01261 (JKS), 2016 WL 154111, at *8 (N.D.N.Y. Jan. 12, 2016) ("Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction.") (citing *Schlup* v. Delo, 513 U.S. 298, 330 (1995)).

Under New York law, "[a] person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person[.]"  P.L. § 125.25(1).  In this context, New York's highest court has explained "the requisite intent to kill . . . can be inferred from the totality of conduct of the accused."  *People v. Horton*, 18 N.Y.2d 355, 359 (1966) (citing *McKenna v. People*, 81 N.Y. 360 (1880)).

Viewing the evidence as a whole and in the light most favorable to the prosecution, a jury could find Petitioner intended to, and did cause, Maxim's death.  The People presented evidence from which a reasonable factfinder could conclude: Croley entered the bar where Maxim was located, exited the bar, and subsequently returned to the area with Petitioner; Croley re-entered the establishment and confirmed Maxim's presence to Petitioner via phone call; Petitioner remained outside of the establishment in order to avoid being "frisked" by security personnel and conceal a firearm while Maxim remained inside; when Maxim exited the establishment, Petitioner followed Maxim as he walked across Washington Avenue towards Columbus' parked vehicle on Cortland Place; Petitioner fired at least four gunshots, striking Maxim's head, arm, and groin, as well as vehicles parked on Cortland Place; Petitioner fled the scene traveling

eastbound on Washington Avenue then north on North Lake Street; and Maxim died as a result of the gunshot injuries.

In other words, taken together, the People's witness testimony, video footage, and communications records were sufficient for the jury to infer that: Petitioner intended to kill Maxim; that he located, followed, and shot Maxim; and that Maxim died as a result of the gunshot injuries.

Petitioner's specific arguments that his conviction was not supported by legally sufficient evidence because "[t]he entire case was circumstantial[; t]here was no murder weapon[;] . . . [t]here was no eyewitness to the murder[;] . . . and [t]here was also no motive presented to the jury" – *see* Pet. at 8 –are unavailing.

First, "[g]uilt beyond a reasonable doubt may be established entirely by circumstantial evidence[.]" *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (citing *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994)); *see also United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) ("[A] conviction may be based upon circumstantial evidence and inferences based upon the evidence[.]") (citing *United States v. Mariani*, 725 F.2d 862, 865-66 (2d Cir. 1984)).

Therefore, Petitioner's suggestion that the circumstantial nature of the People's case rendered his conviction legally insufficient is meritless. *See*, *e.g.*, *Friedgood v. Keane*, 51 F. Supp. 2d 327, 343 (E.D.N.Y. 1999) (concluding "the petitioner's conviction [wa]s supported by constitutionally sufficient evidence" because "[a]lthough all of the evidence used to convict the petitioner of [the victim]'s murder was circumstantial, such evidence may be the basis for a conviction.") (citing *Strauss*, 999 F.2d at 696);

*Maldonado*, 86 F.at 36 (explaining "a lack of direct evidence does not preclude a conviction on circumstantial evidence.").

Next, the People's failure to produce the "murder weapon" at trial did not preclude the jury from returning a sufficiently supported verdict of guilty. *See*, *e.g.*, *King v. Mantello*, No. 1:98-CV-7603, 2002 WL 32100251, at *16 (E.D.N.Y. Nov. 19, 2002) (rejecting the petitioner's challenge to the sufficiency of the evidence supporting his conviction of murder in the second degree based on, *inter alia*, "the police's failure to recover the murder weapon[.]"), *report and recommendation adopted*, 2003 WL 1873618 (E.D.N.Y. Apr. 11, 2003).

Nor did the lack of eyewitnesses to the shooting render Petitioner's conviction unsupported. *See*, *e.g.*, *Garbez v. Greiner*, No. 1:01-CV-9865, 2002 WL 1760960, at *7 (S.D.N.Y. July 30, 2002) (rejecting the Petitioner's claim "that there was insufficient evidence" supporting his conviction of murder in the second degree "because the prosecution 'failed to produce any eyewitness who actually saw petitioner shoot the decedent[,]'" explaining, "there is no requirement that a criminal conviction be based on direct evidence such as eyewitness testimony."); *Ricco v. Coughlin*, No. 86-CV-8245, 1987 WL 18663, at *5 (S.D.N.Y. Oct. 14, 1987) ("Although there were no eyewitnesses to the actual shooting, . . . [a] rational trier of fact could have found that petitioner fired the shots that killed the [victim], and that he intended to kill [him.]").

Finally, Petitioner's conviction is not legally insufficient because the prosecutor failed to offer a "motive" for Maxim's murder. *See*, *e.g.*, *Sutton v. Graham*, No. 11-CV-06532, 2012 WL 4103884, at *10 (W.D.N.Y. Sept. 17, 2012) ("[t]o the extent Petitioner claims that the proof at trial was legally insufficient because the People failed to

52

establish a motive for the murders, said claim is meritless [because] . . . motive is not an element of . . . second degree murder[.]"); *Ruttlen v. Conway*, No. 1:04-CV-0173, 2007 WL 952049, at *6 (W.D.N.Y. Mar. 29, 2007) (rejecting the argument that the evidence supporting petitioner's convictions was legally insufficient where "the prosecution did not present any eyewitnesses, fingerprints or motive for killing" the victim, because "[t]hese items are not essential elements of the crimes for which [the petitioner] was charged[,]" including murder in the second degree).[19]

In sum, viewing the evidence in the light most favorable to the prosecution, a rational jury could find Petitioner, with intent to cause the death of another person, caused Maxim's death.  As a result, Petitioner is unable to demonstrate that he was prejudiced by counsel's failure to properly preserve this claim; therefore, Petitioner cannot rely on ineffective assistance as a cause to excuse the procedural default of his challenge to the sufficiency of the evidence supporting his conviction.  Accordingly, Petitioner's legal sufficiency claim is dismissed.

### C. <u>Prosecutorial Misconduct</u>

Finally, Petitioner avers comments made by the A.D.A. during the People's summation amounted to prosecutorial misconduct.  *See* Pet. at 8-9.  On direct appeal, the Third Department "reject[ed Petitioner]'s contention that counsel was ineffective for failing to object to the prosecutor's allegedly improper summation, finding that the prosecutor's summation was proper and fair comment on the evidence."  *White-Span*,

---

[19] *See also*, *e.g.*, *McKinney v. Burge*, No. 9:04-CV-1150 (GTS/DEP), 2009 WL 666396, at *25-28 (N.D.N.Y. Mar. 10, 2009) (dismissing the petitioner's claim that the evidence was not legally sufficient because "the case against [petitioner] was purely circumstantial . . . there were no eye-witnesses, no physical evidence, and no fingerprints or DNA evidence linking" the petitioner to the crimes); *Perkins v. McGinnis*, No. 9:05-CV-0443 (DNH/VEB), 2008 WL 4372650, at *8-10 (N.D.N.Y. Sept. 19, 2008) (dismissing the petitioner's claim concerning the sufficiency of the evidence supporting his conviction based where, *inter alia*, "there was no weapon ever found, [and] no motive established[.]").

182 A.D.3d at 916.  Respondent contends the Appellate Division reasonably rejected Petitioner's prosecutorial misconduct claim.  *See* Dkt. No. 14-1 at 34-38.

Where, as here, a convicted defendant claims the prosecutor's comments amounted to misconduct, "the relevant question is whether the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 169 (1986).[20]  Additionally, because the state court's decision is entitled to deference under the AEDPA, Petitioner must prove the Appellate Division's denial of his "prosecutorial misconduct claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Parker*, 567 U.S. at 47 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

In evaluating a challenge to a prosecutor's summation, the Second Circuit has assessed "three factors: the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements."  *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) (citation omitted); *see also Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990) ("Although *Modica* was a direct appeal from a federal conviction, [the Second Circuit] ha[s] also invoked *Modica* in collateral attacks on state court convictions to determine whether the trial was fundamentally unfair.") (citations omitted).

---

[20] *See also Parker v. Matthews*, 567 U.S. 37, 47 (2012) (explaining "[t]he 'clearly established [f]ederal law" relevant" where the state court rejected the petitioner's claim that the prosecutor's remarks in closing constituted a denial of his due process rights "is our decision in *Darden v. Wainwright*[.]").

   1.  **"Testifying"**

Petitioner first argues that his due process rights were violated when the prosecutor "played a video clip recorded [by] a camera [facing] east on Washington Ave." as he "testif[ied] that Petitioner can be seen [on the video clip] walking behind the victim[.]"  Pet at 9.

As relevant here, the prosecutor argued "[Petitioner] was at Cortland [Place] . . . because he's on video walking east on Washington [Avenue] after [Maxim] just before the shooting[,]" apparently displaying video footage, and remarked:

> [T]his is 522 looking east and you saw this in the compilation but it went fast and the brightness was too bright and it's hard to see, but what you're going to see is Willies over here, Cortland is way up here. You're going to see two people walk across the street, I submit to you. When you time it up with the Willies video, it's [Columbus] and [Maxim] crossing the street walking to Cortland. And just after that, it's tough because a car goes by and the headlights kind of wash it out, you're going to see another person follow them and walk over here onto the sidewalk. Right there. One, two. Crossing the street, walking towards Cortland. Right there. See him? *I recognize that's hard to see, but if you watch it a thousand times like I have, you're going to see a person walking across the street there and I submit to you that is [Petitioner] hunting his prey.*

T 989-91 (emphasis added).  Petitioner contends "[t]he prosecutor stating that he watched this video a thousand times so [the jury] can trust his judgment on the invisible figure inside the added red circle on [sic] being petitioner[] violated Petitioner[']s due process rights."  Traverse at 21.

While "it is improper for a prosecutor to mischaracterize the evidence or refer in summation to facts not in evidence[,]" *United States v. Rosa*, 17 F.3d 1531, 1548-49 (2d Cir. 1994) (citation omitted), a prosecutor's "remarks [which] present[] one view of the evidence, which the jury could accept or reject based on its own judgment and

knowledge of the entire record" do not constitute misconduct.  *United States v. Hawkins*, 125 F. App'x 364, 366 (2d Cir. 2005).

Upon review, the prosecutor's comment which directed the jury to conclude the individual depicted following Maxim and Columbus was Petitioner merely presented a conclusion which the jury was free to accept or reject based on record evidence, which included other portions of video footage and witness testimony concerning the location of an individual matching Petitioner's description.

As such, these remarks were fair comments on the evidence.  *See Battease v. Chappis*, No. 9:11-CV-1072 (JKS), 2013 WL 6589566, at *14-15 (N.D.N.Y. Dec. 16, 2013) (rejecting the petitioner's argument "that the prosecution committed misconduct during closing argument by representing that a video clip showed [a witness] 'snatching' a pill from [the petitioner]'s mouth" concluding the prosecutor's comment did "not amount to misconduct, but rather constituted a 'fair comment on the evidence' and a 'fair response to remarks made by the defense counsel during summation.'") (quoting *Osorio v. Conway*, 496 F. Supp. 2d 285, 301 (S.D.N.Y. 2007)); *Holder v. Lamanna*, No. 1:18-CV-7431, 2020 WL 804902, at *10 (E.D.N.Y. Feb. 18, 2020) (concluding the prosecutor's comment regarding video evidence, including: "'[l]ook at where his right arm is right there. It looks as though he is holding something. Maybe when you are running with a gun [it] doesn't stay so securely in your waistband. That's what I infer from that picture what is going on'" did not amount to misconduct, explaining "the prosecutor did not step outside of the appropriate bounds of behavior in making these comments, as he was merely properly directing the jurors to evaluate and draw inferences from the evidence.") (citations omitted).

Furthermore, prior to the attorneys' summations, the Albany County Court had instructed the jury:

> First, you are the finders of fact and it is for you and you alone to determine the facts from the evidence that you find to be truthful and accurate. Thus, you should remember that whatever the lawyers say and however they say it is simply argument submitted for consideration.
>
> Second, remember that the lawyers are not witnesses in the case so if a lawyer does assert as fact something that is not based on the evidence, then you must disregard it. Nothing that the lawyers say at any time, including their summation, is evidence.  You have heard the evidence and you must decide the case on the evidence as you find it and on the law as I explain it to you.

T 916-17.[21]  "[J]uries are presumed to follow their instructions"– *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) –and similar language has been held to cure even improper summation remarks; therefore, this Court is unable to conclude petitioner was deprived of a fair trial.  *See United States v. Elias*, 285 F.3d 183, 192 (2d Cir. 2002) (the trial court's charge, which instructed the jury "that '[c]ertain things are not evidence and are to be disregarded by you in deciding what the facts are. Arguments or statements by the lawyers are not evidence'" cured misconduct which occurred during the prosecution's summation; therefore, "although the prosecutor's remarks were improper, they did not result in substantial prejudice to [the defendant] or deprive him of a fair trial.").

Finally, the prosecutor's use of the term "hunting" to characterize Croley and Petitioner's conduct around Maxim did not constitute any misconduct in light of the evidence admitted at trial.  *See, e.g.*, *Portes v. Capra*, 420 F. Supp. 3d 49, 58 (E.D.N.Y. 2018) (explaining "[t]he prosecutor's use of the term 'hunting' is derived from the

---

[21] Following the summations by Petitioner's attorney, Croley's attorney, and the prosecutor, the trial court also instructed the jury "to consider only the evidence which in this case includes the testimony of witnesses and exhibits which were received in evidence."  T 1009-10.

evidence adduced at trial; and, as such is a permissible inference that cannot serve as a basis for a viable prosecutorial misconduct claim" citing a witness's testimony "that Petitioner and another individual tracked down the decedent by . . . driving to a club they thought that the decedent was frequenting . . . [and that] Petitioner was armed and had planned to use [another individual] as a lookout.").

      **2.**   <u>**"Inventing Conversations"**</u>

Petitioner also contends "the prosecutor committed misconduct by misstating the evidence, inventing conversations between Petitioner and [the] co-defendant that w[ere] not supported by any evidence[.]"  Pet. at 9.

In the relevant portion of his summation, the prosecutor averred:

> I want to take a few minutes just to walk through the timeline step by step . . . [Maxim] arrives, 2:03. Five minutes later [Croley] arrives, walks into the bar. Costs him 20 bucks to get in, right? Immediately calls [Petitioner] at 2:10. Here's the phone call. 478-4920 calls 301-7356. Sixteen-second call. *I've got eyes on the target.* When you look at the cell phone records, the tower records . . . [Croley]'s phone . . . hits off of a cell tower just south of Willies and Stewart's but [Petitioner]'s phone hits off of a tower in North Albany 2:10.
> [Croley] leaves. Four minutes in Willies . . . He put his eyes on [Maxim], he called [Petitioner], and he leaves . . . [Croley], I submit to you, is going to pick up [Petitioner] . . .
> 2:37 they arrive at Stewart's. Two minutes later [Croley] walks back into Willies. [Petitioner] waits outside . . . There are five phone calls during that time. You just went and you got [Petitioner] and you brought him to hang outside so you could go inside and call him five times? That's what you're supposed to believe?
> From 2:42 to 2:47. [Croley] calling [Petitioner], [Petitioner] calling [Croley], [Croley] calling him back. And you can see from the video, you'll see [Croley] right there. See his arm up to his ear? See the red hat? That was him just before he left. Those phone calls correspond to that and they're both hitting off of this tower now . . .
> At 2:48, [Croley] leaves . . . it appears at that moment that [Maxim] is leaving, he's walking towards the front door. At that

moment [Croley] calls [Petitioner] and starts working his way to the front door. But what happens is [Maxim] stops at the front door and so [Croley] continues out and waits for him outside . . . There's [Maxim]; there's [Croley] right there. And who is he calling? He's calling [Petitioner]. *The target's on the move. He's about to leave.* Look for the red hat, guy in the white sweatshirt . . . you'll see he's on the phone. See his arm? Right there. Working his way toward the front of the bar. And you'll see that that phone call that corresponds to that lasts several seconds . . .

You'll see [Croley] right there, the guy in the white sweatshirt. See his arm? Phone up to his ear. He's calling [Petitioner] . . . . Goes, stands next to [Maxim], watches [Maxim], follows [Maxim] as it looks like he's leaving . . .

At 3:05 [Maxim] walks out. There's a phone call right now. A fourteen-second phone call. [Croley] calling [Petitioner]. *I submit to you he's telling him, that's him, he's walking out of the bar right now. That's a reasonable inference to be drawn.* And then you watch, the phone call ends, there goes [Petitioner] after the target. One minute later, there goes [Croley], the same area, to keep an eye on what's going on.

In that three minutes, [Maxim] is shot . . . Of all the times in the whole world for [Maxim] to have been shot, the defense wants you to believe it just happened to be at this moment and it's got nothing to do with these two.

T 995-1001 (emphasis added).

"The government has broad latitude in the inferences it may reasonably suggest to the jury during summation." *United States v. Casamento*, 887 F.2d 1141, 1189 (2d Cir.1989) (citations omitted), *cert. denied*, 493 U.S. 1081 (1990). Therefore, a prosecutor's indication that the jury should make specific inferences from the evidence adduced at trial is not outside of the appropriate bounds of appropriate conduct. *See, e.g.*, *McCall v. Artus*, No. 1:06-CV-3365, 2008 WL 4501834, at *14 (S.D.N.Y. Sept. 29, 2008) (concluding "the prosecutor's speculation as to what had happened to the gun did not fundamentally taint Petitioner's trial" where the prosecutor stated, on summation, "'[y]ou should focus on the fact [that] no weapon was recovered. Let me remind you [of]

the reason we don't have a weapon, [Petitioner] took his gun with him.'") (citing *United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir. 1993)) (additional citation omitted); *Dzebolo v. Perez*, No. 7:07-CV-3421, 2012 WL 4763090, at *6 (S.D.N.Y. Jan. 12, 2012) (rejecting the petitioner's argument "that the prosecutor's speculation regarding the contents of the plastic bag petitioner had discarded in the dumpster 'went beyond a fair comment on the evidence,' thereby depriving petitioner of a fair trial" because "although the garbage bag itself was never found," testimony presented at trial established that "the petitioner left the apartment with a large plastic bag . . . [and the] bed upon which the victim lay had no fitted sheet; there were no towels in the bathroom; the apartment had been freshly cleaned and the victim's teeth were missing" therefore, it was "reasonably inferable that the petitioner had removed incriminating evidence from the apartment-possibly a 'bloody shirt,' 'bloody clothes,' 'a bloody sheet,' 'a glove [petitioner] wore when she cleaned the bathroom,' or the victim's 'teeth'-and disposed of it before calling 911."), *report and recommendation adopted*, , 2012 WL 5382666 (S.D.N.Y. Nov. 2, 2012).

Upon review, the prosecutor's argument that the jury could infer Croley's conversations with Petitioner concerned Maxim's whereabouts was a fair comment on the evidence.  The People admitted evidence at trial from which the jury could infer Croley made multiple calls to a phone in Petitioner's possession while inside Willies, where Maxim was located, in the minutes preceding Maxim's departure.

Furthermore, the prosecutor's remarks were responsive to Croley's counsel's comments about the phone records.  On summation, Croley's attorney averred:

> [T]here's no testimony from anyone that [Petitioner]'s on the phone when he's standing outside the bar . . .

But let's just assume it's there. Okay? Let's further assume that there's phone calls going back and forth between these two guys. So what. What does it prove? They want you to further assume that the conversation must be about killing [Maxim]. Really? Two guys talking, one in a bar and one outside a bar. Couldn't be any other possible explanation. Two guys talking on a phone. Here's a couple of [th]em. Hey, Yo, there's a lot of people in here but I don't know anybody. Or, Oh, you better not come in here, that crazy girl that was stalking you last night, she's here, you don't want to be around. Or, Dude, you gotta come in, this DJ is off the hook, or whatever the kids say these days. Reasonable explanations? Reasonable inferences to draw? Inferences consistent with innocence? Remember, if you can think of even one of them, [Croley] is entitled to that inference.

T 943-44.  In a later portion of the summation, Croley's defense counsel further argued:

[The People] want you to believe that that was [Croley] was picking up [Petitioner] because there were phone calls back and forth and they were arranging a pickup and whatnot . . . But again, even if it's true, so what. So what. So they're calling each other. Dude, you hear those shots? Yeah. We should get the hell out of here. This place is not safe. Let's go. Let me pick you up. Where you at? I don't know. I'm around here someplace. I got lost. I ran and I took a left and – okay, now I see where I am. I'm close to Stewart's. Okay, I'll be right there.

T 946-48.  Therefore, the prosecutor's suggestion that Maxim's location may have been the actual subject of Petitioner and Croley's communications was not inappropriate.

*See United States v. Young*, 470 U.S. 1, 12-13 (1985) (explaining that "if the prosecutor's remarks were 'invited,' and did no more than respond [to defense counsel's comments] . . . such comments would not warrant reversing a conviction.").

Moreover, it would have been clear to the jury that the prosecutor's narrative of the phone calls was merely the People's theory as to what Croley's statements may have been. The prosecutor explicitly stated there were no recordings of the calls and

the trial court instructed the jury that the attorneys' summations were not evidence.  *See* T 986 (the prosecutor stating: "[n]o, we don't have recorded calls . . . "); T 917.

Because it would have been obvious to the jury that the prosecutor's remarks were not recitations of the calls' actual contents, Petitioner was not substantially prejudiced by the comment.  *See*, *e.g.*, *Maiello v. Edwards*, No. 1:96-CV-3426, 1998 WL 230956, at *3 (S.D.N.Y. May 7, 1998) (explaining that while "the prosecutor's speculation about the defendant's actions and thoughts as the events of the crime" occurred was "improper . . . It would have been obvious to the jury that the prosecutor was doing nothing other than engaging in speculation" therefore, "the prosecutor's speculation during summation about the defendant's acts and thoughts was not, in the context of this trial, prejudicial error.") (citations omitted), *aff'd*, 199 F.3d 1322 (2d Cir. 1999).

Additionally, as stated above, the Albany County Court had instructed the jurors "that the lawyers are not witnesses[,]" the lawyers' summations are not evidence, and it is the jurors' "own recollection, [their] own understanding. And [their] own evaluation of the evidence that controls regardless of what the lawyers have said[.]"  T 917.

### 3. <u>Characterization of the Murder as a "Hit[,] Petitioner as a "Contract Killer[,]" and Alluding to Information not in Evidence</u>

Finally, Petitioner claims the prosecutor "characterized Petitioner as a [c]ontract killer" and "told the jury that the crime was a 'hit' without any evidence to support the claim because [the prosecutor] [sic] even he admitted that there was no motive to offer the jury[.]"  Pet. at 9.

In the portion of the summation at issue, the prosecutor argued:

Nobody else was shot. And that's important. This isn't some random shooter shooting spree, drive by, shoot whoever you see. There were no arguments or fights. This isn't a case where [Maxim] bumped into somebody at the bar and they got mad and went outside and there was a fight in the street and [Maxim] just happened to be the one who got shot. It's not a robbery. [Maxim]'s wallet stayed in his pocket all the way to the hospital. You saw that exhibit. Why does that matter? It matters because this is not a case where [Maxim] was in the wrong place at the wrong time. This is a case where [Maxim] was hunted by the wrong people. Think about it. If I'm out, the shooter is out there just to rob somebody, there are targets everywhere, right? There's people by Stewart's, there's people in front of Willies, there's this group of guys on Cortland. There are targets everywhere. If it's just a random shooting, a random case, there are targets everywhere so, you know, [Maxim] just happened to be there. *But if* [Maxim] *is a target, and I submit to you when you look at all the evidence there's no other conclusion than that* [Maxim] *is a target, this is a hit all day long,* that changes things because now the shooter needs to know where the target is. Right? It's not just random some guy in the street I'm going to rob who I shoot. I need to know where the target is. That's where [Maxim] is. And that starts to limit the potential shooters in your mind because it has to be someone who knows [Maxim] is there at that moment.

T 964-65 (emphasis added).  After explaining the People's timeline of the events

precenting Maxim's death, the prosecutor further remarked:

[D]efendant is charged with murder in the second degree. Basically says with the intent to cause the death of another, caused the death of that person . . . As far as intent goes, this isn't a case where somebody shot somebody in the leg and hit an artery so you have to try to figure out what their intent was. This speaks for itself. The shooting in this case, the actions of these defendants, speak for themselves. *This is a hunt. This is a hit. This isn't an argument. This isn't a fight gone awry. This is clear. Move in, hit the target, get out.*

T 1003 (emphasis added).  Petitioner argues, in addition to lacking supporting evidence, these comments by the prosecutor "tried to allude to" "information not in evidence" citing the aforementioned letter from the prosecutor to defense counsel.[22]

Contrary to Petitioner's contention, the prosecutor neither referred to him as a "contract killer" nor suggested Petitioner killed Maxim on another person's behalf or in exchange for some benefit.  Rather, the prosecutor appeared to concede the People had not presented evidence with respect to any motive to kill Maxim, instead emphasizing a verdict of guilty required no conclusions as to motive.  *See* T 1006-07 ("This case is way beyond a reasonable doubt when you put the pieces of the puzzle together . . . [and i]f it's a landscape, there might be a little piece of the tree missing, the motive, right? You don't know the motive, but you don't have to know the motive.").

Nor did the prosecutor "refer in summation to facts not in evidence."  *Rosa*, 17 F.3d at 1548-49.  While the prosecutor was aware of the "rumor" that Maxim "was a 'sneak thief'" and "stole money[,]" no such evidence was presented at trial and nothing in the People's summation suggested there was information supporting the conclusion that Petitioner murdered Maxim beyond the evidence which was admitted at trial.  *See Brown v. Filion*, No. 1:03-CV-5391, 2005 WL 1388053, at *15 (S.D.N.Y. June 13, 2005) (rejecting the petitioner's claim that the prosecutor committed misconduct by referring to facts not in evidence, noting "[d]efense counsel had focused in his summation on the fact that no money had been recovered" but the prosecutor's summation "did not suggest that there was any evidence introduced at trial as to what happened to the money. Rather," the People's summation "suggested the opposite: that there was no

---

[22] *See* SR 503-04, Letter from David Rossi to Paul F. Dwyer.

evidence on this point and that this lack of proof made no difference to the jury's finding of guilt on the elements of the crimes charged."), *report and recommendation adopted*, 2005 WL 2159675 (S.D.N.Y. Sept. 6, 2005).

Turning to the prosecutor's references to Maxim as a "target," such a characterization was reasonably inferable from the evidence.  Testimony established there were multiple individuals on Cortland Place at the time gunshots were fired, yet Maxim was the only person struck and Maxim sustained multiple gunshot wounds.

Therefore, the prosecutor's conclusion that Maxim was the shooter's "target" was a reasonable inference to suggest based on the facts in evidence.  *See generally, Casamento*, 887 F.2d at 1189 ("the government has broad latitude in the inferences it may reasonably suggest to the jury during summation."); *United States v. Wilner*, 523 F.2d 68, 74 (2d Cir. 1975) ("A prosecuting attorney is not an automaton whose role on summation is limited to parroting facts already before the jury.").

Similarly, the prosecutor's use of the term "hit" to distinguish Maxim's murder from a "shooting spree, drive by, . . . bar [fight, or] . . . robbery" and argue the nature of Maxim's fatal injuries demonstrate the shooter "inten[ded] to cause [his] death" did not substantially prejudice Petitioner's case.  When viewed in context, the prosecutor's classification of Maxim's death as a "hit" orchestrated by the individuals who– had been engaged in communications with each other immediately prior to Maxim's death, where Maxim was located, then exited the establishment in close proximity to Maxim's departure, and later left the area of the scene of Maxim's death around the time gunshots were fired –was a fair comment on the evidence.  *Robinson v. Graham*, 671 F.

Supp. 2d 338, 361 (N.D.N.Y. 2009) ("[t]he prosecutor's comment must be viewed in context, including the argument that immediately followed it.").

In sum, the prosecutor's summation remarks concerning the video evidence, the potential subject of communications between Petitioner and Croley, and description of Maxim's death constituted fair comments on the evidence submitted to the jury.  As such, the prosecutor's statements did not "so infect[ Petitioner's] trial with unfairness as to make the resulting conviction a denial of due process"– *Darden*, 477 U.S. at 169 – therefore, the Third Department's denial of this claim was not an unreasonable application of clearly established federal law.  Accordingly, Petitioner's claims of prosecutorial misconduct claim are dismissed.

## V.   **CONCLUSION**

Therefore, it is

ORDERED that

1. The petition, Dkt. No. 1, be **DENIED and DISMISSED** in its entirety;

2.  No Certificate of Appealability ("COA") shall issue because petitioner has failed to make a substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires; [23]

3.  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and

---

[23] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).

4.  The Clerk shall serve a copy of this Order upon the parties in accordance with the

Local Rules.

IT IS SO ORDERED.


Dated:  January 8, 2024
        Utica, New York.

David N. Hurd
U.S. District Judge